755 So.2d 79 (2000)
In re CERTIFICATION OF the NEED FOR ADDITIONAL JUDGES.
No. SC00-372.
Supreme Court of Florida.
February 29, 2000.
HARDING, C.J.
Under the provisions of article V, section 9 of the Florida Constitution, the Supreme Court of Florida is responsible for determining the need for additional judges or the necessity for decreasing the number of judges required to consider cases filed before the respective courts. To this end, we have analyzed case filings and disposition data, and evaluated the growth in judicial workload over the past several years. These data and the requests of the various circuit and district courts have been made available to the Legislature through the Office of the State Courts Administrator.
After carefully reviewing requests for a total of 51 new judges, we hereby certify the need for 30 additional circuit judges and 13 additional county judges, for a total of 43 new judicial positions. A comparison of the requests for new judges filed by the respective courts and the new judges certified as needed for Fiscal Year 2000-01 follows:

 Judgeships Judgeships Judgeships Judgeships
Circuit Court Requested Certified County Court Requested Certified
First 1 1 Okaloosa 1 1
Second 2 1
Third 1 1
Fourth 2 2 Duval 2 1
Fifth 3 2 Lake 1 1
Sixth 2 1 Pasco 1 1
 Pinellas 1 1
Seventh 1 1
Eighth 1 0
Ninth 3 3 Orange 1 0
Tenth 1 1 Polk 1 1
Eleventh 3 3
Twelfth 0 0 Sarasota 1 1
Thirteenth 2 2 Hillsborough 2 2
Fourteenth 1 1
Fifteenth 3 3 Palm Beach 2 0
Sixteenth 0 0
Seventeenth 4 4 Broward 2 2
Eighteenth 1 1 Brevard 2 2
Nineteenth 1 1
Twentieth 2 2
Totals 34 30 Totals 17 13

DISTRICT COURTS OF APPEAL
The criteria for certification of the need for additional judges in the district courts of appeal are set forth in rule 2.035(b)(2), Florida Rules of Judicial Administration. The Court did not receive any requests for additional judges from the five district courts of appeal. The last new judgeship for the district courts was authorized in 1999, for the Fifth District Court of Appeal. This was the first new judgeship at the district court level since 1993.
The number of net annual filings in the district courts is forecast to undergo a slight decrease, although some of the individual district courts will still experience modest increases. It is forecast that a total of 21,176 cases will be filed in the district courts in the year 2000, which is less than a one percent decrease from 1998. This decrease comes after a period of steady growth in caseloads, from 1993 through 1997.
*80 In previous years, the district courts have addressed workload pressures through various means. They have improved internal operating procedures, established central legal research staffs to handle selected matters, assigned senior judges to hear appeals on a temporary basis, and experimented with mediation of selected matters. We encourage the district courts to continue developing alternative means to efficiently and fairly resolve the cases brought before them.
For the foregoing reasons, we are not certifying the need for any additional district court of appeal judgeships. However, we urge the Legislature's favorable consideration of requests by the district courts of appeal for workload-related resources.

TRIAL COURTS
The criteria for certification of the need for judges in trial courts, which the Court has used in the past, are set forth in rule 2.035(b)(1), Florida Rules of Judicial Administration. Consistent with previous practice, we have placed the greatest weight on quantitative data reflecting the growth and composition of caseloads in the various circuit and county courts.
Additionally, this year we applied a Delphi-based caseload weighting system in assessing judicial workload, pursuant to a request by the Florida Legislature in proviso language in the 1998 General Appropriations Act. In doing so, we have made a good faith effort to satisfy both the letter and intent of the proviso language adopted by the Florida Legislature, which states that:
$75,000 shall be used to contract for the development of a Delphi-based caseload weighting system to determine the optimum caseloads for circuit and county judges and, in conjunction with other factors, to determine the need for additional circuit and county court judges. The judicial branch shall consult with the Office of Program Policy Analysis and Government Accountability on defining the scope of work, selecting a consultant, and choosing a methodology for developing case weights and determining available judge time. A report shall be issued not later than February 1, 1999 on the development of case weights and their use in the judicial certification process.
The overall effort to develop case weights was highly inclusive of judges representing all twenty judicial circuits and every division of court in urban as well as rural jurisdictions. The Delphi Policy Committee, appointed by the Chief Justice to guide the project, worked closely with the National Center for State Courts and the Office of the State Courts Administrator to achieve a successful conclusion. Continuous input was also solicited from chief judges and the Court Statistics and Workload Committee. Acceptance of the results of the Florida Delphi-based weighted caseload project by chief judges and participating trial judges is high. The consulting team from the National Center for State Courts was comprised of professionals with experience developing weighted caseload systems for a number of states, including Michigan, Minnesota, Colorado, Wisconsin, and New Mexico. Their experience contributed significantly to the quality of the work product. Further, we have sought the active participation and advice of the Office of Program Policy Analysis and Government Accountability throughout this project.
The high level of interest and participation in the study and the methodology utilized by the National Center for State Courts resulted in a rigorous assessment of judicial workload. The Florida Delphi Weighted Caseload Final Report (hereinafter referred to as the Delphi Report) details the rationale for and methodology employed in development of the recommended case weights. The decisions of the Delphi Policy Committee which set the parameters for the project were validated by a time study. We find the assumptions made by the consultants, as outlined in *81 Appendix G of the Delphi Report, to be reasonable.
The study yielded three separate methods of calculating case weights:
 Delphi-derived relative case weights;
 Delphi-derived time-estimated case weights; and
 Event-based time-study case weights.
After review and reconciliation of the three models by the Delphi Policy Committee it was concluded that event-based time-study case weights produced a highly valid and reliable assessment of the time that is currently being committed to judicial work at the circuit and county court levels. The resulting case weights reflect "what is" in terms of the judicial time devoted to different cases and non-case-related activity. We concur in this finding.
The application of Delphi consensus building methodology to the objective, event-based time-study case weights yielded "reasonable caseload" standards. This was accomplished by considering the Delphi-derived relative and time-estimated case weights. Reasonable caseload reflects "what ought to be," or "optimum caseload," which was defined by the Court's Delphi Policy Committee as "the number of Delphi weighted cases necessary to allow sufficient time for a judge to deal with the `average case' in a satisfactory and timely manner." The case weights for 10 of the 22 circuit case categories and 3 of the 8 county case categories were adjusted to establish the reasonable caseload standards.
We accept the recommended reasonable caseload standards as the primary basis for the certification of the need for additional judges, with the exception of the weights for the circuit case categories of drugs and dissolution, and the county case categories of evictions and civil traffic. For the reasons cited in the Delphi Report, we conclude that further study of the workload for these four categories needs to be undertaken prior to their adoption.
We accept the increase in time for juvenile dependency cases established as "reasonable caseload" by the Delphi Policy Committee as a conscious policy choice to increase the priority of, and resources for, this important circuit court division. This will help ensure that the handling of cases involving children who may be abused or neglected is timely, efficient, effective, and consistent with the high priority placed on children's issues by Florida's Legislature and Governor. Considerable progress has been made in this regard over the last several years as the result of comprehensive study, planning, and implementation of reforms through our Dependency Court Improvement Program. However, recent legislation such as the Kayla McKean Act and proposed funding increases for staff at the Department of Children and Families will likely increase workload for the dependency divisions of the circuit courts.
We have a related concern about the time study results and reasonable caseload standards recommended for juvenile delinquency. The allocation of judicial time and resources for handling these cases has been and continues to be a concern for the Court. Delinquency cases need to be considered in a manner that is not only timely but also provides the children, families, and victims with appropriate judicial attention and coordination of services necessary to effectuate public policy and respond to society's expectations in regard to juvenile crime. We are not confident that the time study results are accurate measures of the judicial resources required. Accordingly, we urge the Legislature and appropriate entities of the executive branch to work with the judiciary in a comprehensive study of the juvenile delinquency system, similar to the successful effort the three branches have undertaken in the area of juvenile dependency.
In last year's certification opinion this Court boldly declared that the judicial branch was joining the executive and legislative branches in putting children first in the allocation of resources:

*82 We also recognize the obligations of the Judicial Branch to join with the Executive and Legislative Branches to give priority to our State's most precious resource our children.
In re Certification of Need for Additional Judges, 728 So.2d 730, 734 (Fla.1999). Shortly thereafter we expressed dismay at the apparent current state of affairs reflecting that the juvenile divisions of the circuit courts were not being adequately treated in the allocation of judicial resources. We noted statewide statistics reflecting that juvenile judges were being asked to manage caseloads dramatically larger than those of their brethren in the other judicial divisions. Finally, we declared our concern:
We fully recognize that the petitioning circuits are acting out of a genuine concern for the welfare of juveniles, but we cannot ignore the pleas of those who assert that Florida's children at times are shortchanged in the allocation of judicial resources. Accordingly, we use this opportunity to express our concern that each judicial circuit in the state ensure that its juvenile division is treated second to none in the allocation of judicial resources. Florida's oft-repeated pledge that "our children come first" cannot ring hollow inof all placesour halls of justice. Judges, prosecutors, public defenders and others serving in the juvenile system cannot hope to make a difference in the life of a single troubled child if they must contend with staggering caseloads made worse by the maldistribution of judicial resources. Technology may offer one innovative way to help courts cope, but it is no substitute for an allocation of resources that meets the needs of society's most precious resourceits children.
Amendment to Florida Rule of Juvenile Procedure 8.100(a), 753 So.2d 541, 545 (Fla.1999) (footnotes omitted).
It should be understood that the time study did not incorporate all judicial work that was conducted during June and September of 1999. No time sheets were maintained by senior judges, who provide approximately the equivalent of 34 fulltime equivalent judge years of service annually. Therefore, funding for senior judge assignments at current or increased levels is imperative if the overall workload of the trial courts is to be managed efficiently and effectively.
Likewise, no data were captured on the work of hearing officers or general masters. Hearing officers are used in many county courts to handle civil traffic infractions and to hear child support matters in circuit court. General masters are employed by a number of courts to hear a variety of actions including, but not limited to: pre- and post-judgment matters in family law; mental health cases brought under the Baker Act; substance abuse cases under the Marchman Act; and various dependency proceedings.
Thus, hearing officers and general masters have become an increasingly important resource for trial judges at the circuit and county levels. They represent a qualitative enhancement in the ability of courts to do fact-finding and explore judicial decision-making options in the trial courts. The availability and use of hearing officers to handle civil traffic infractions where, absent a defendant's request to have the case heard by a judge, their decisions are final, provides direct workload support.
However, the statewide impact of these resources on judicial workload is not well documented. We urge the Legislature to consider funding an assessment of the use of these quasi-judicial personnel in Florida's courts, and their relationship to the case weights derived from the recent study.
Taking the foregoing factors into consideration, this year's certification of need for additional judges is based primarily on the results of the time study, adjusted to the "reasonable caseload" standards for all but the case categories of circuit drugs and *83 dissolution, and county evictions and civil traffic infractions. The majority of supplemental factors outlined in rule 2.035(b)(1), Florida Rules of Judicial Administration, which this Court has considered in evaluating requests for judgeships in the past, are satisfactorily accounted for in the calculus of the time study and the resulting case weights. Examples include the nature and complexity of cases, the availability of case management support staff, geography of the circuit, extent of use of mediation, and requirements for court interpreting. Accordingly, we restricted our consideration of supplemental factors this year to (1) jury trial rates, and (2) availability and use of county judges on temporary assignment to the circuit court.
We compared the jury trial rates for the various circuits and counties requesting judges with the assumption used by the National Center for State Courts in calculating the case weights that, on the average, circuit and county judges heard 14.8 and 8.8 jury trials per year in 1998. In reality, there are substantial variations in jury trial rates which, in some instances, we believe warranted greater or fewer judgeships than the "reasonable caseload" weights yielded. We also assessed the availability of county judges to serve on a temporary basis to assist with circuit court workload, which influenced our decision relative to some courts. Finally, we resolved not to certify more judgeships than were requested, notwithstanding that the case weighting formula reflected a greater need in some instances.
The 30 circuit and 13 county additional judgeships deemed necessary constitute a somewhat larger certification of need than in prior years for several reasons. First, in past years the Court has applied the criteria in rule 2.035(b)(1), Florida Rules of Judicial Administration, very conservatively. The Delphi Report states that the time study reveals that the thresholds used by the Court, at which it was presumed there was a need for additional circuit and county judgeships, were too high. The implication is that the methodology we have used in the past to assess judgeship needs underestimated actual requirements. The mix of cases in various of Florida's circuit and county courts, when weighted to reflect differential requirements for judicial time, demands considerably more judicial resources than are currently authorized.
Second, the overall workload of Florida's circuit courts continues to grow at a steady rate. From 1997 through 2000, total circuit court filings are projected to increase two percent. Of particular note are greater-than-average increases in the felony and civil divisions of the circuit court which involve more complex cases and trial activity. As in the circuit courts, caseloads in Florida's county courts continue to increase at a steady rate. County court case filings, excluding the category of civil traffic infractions, increased over eleven percent from actual 1997 data to those forecast for 2000. This increase is primarily attributable to growth in misdemeanor and criminal traffic case filings and, in part, accounts for the higher than usual certification of need for county judges.
While we have accepted and, with the qualifications noted previously, applied the Delphi-based weighted caseload system in preparing this certification of need, we have a concern regarding judicial support resources, which are a critical part of the infrastructure in the trial courts and the Office of the State Courts Administrator. The time study results, and hence the reasonable caseload adjustments, are a function of the existing mix of supplemental resources in the individual trial courts. These resources include senior judges, general masters and hearing officers, mediators, trial court staff attorneys, and case management personnel, among others. If these resources are reduced or eliminated during the transition to state funding under Constitutional Revision 7 or due to future budget constraints, then the number of judges necessary could rise substantially because judges would be required *84 to perform additional case-related work. Indeed, an increase in the availability of certain of these resources is already necessary. For instance, the State Courts System budget request seeks additional trial court law clerks, who provide tremendous assistance to circuit and county court judges in almost every division of those courts.
Further, the application, maintenance and periodic update of the Delphi-based weighted caseload is far more labor intensive than administration of the certification process and criteria used in previous years. Data forecasting requirements have increased fourfold and the application of case weights requires a higher level of accuracy in the baseline filings and disposition data reported to the Office of the State Courts Administrator by the clerks of court. The National Center for State Courts recommended legislative approval of additional staff and expenses to address such requirements.
The Court urges favorable action on the Fiscal Year 2000-01 budget request for additional statisticians and audit staff to assist in the preparation of future certifications of need for additional judges utilizing the case weighting methodology and ensure the supporting data are as uniform and accurate as possible. Both the judicial and legislative branches will benefit from improved case-related data generated under our Summary Reporting System (SRS), as that data will no doubt be used frequently for decision making in the implementation of Constitutional Revision 7. Finally, past and pending substantive legislation and budget issues could increase future needs for additional judgeships. Examples include legislation involving enhanced criminal penalties such as "10-20-Life," "Three Strikes," the Kayla McKean Act, and the recent death penalty revisions, most of the effects of which are still downstream. Other workload implications may be realized from executive or legislative funding priorities such as additional prosecutors for gun-related offenses or 10-20-Life and substantial increases in field workers for the Department of Children and Families. Often these changes cannot be measured in terms of the need for full-time judicial positions in any given jurisdiction, but instead serve to cumulatively increase judicial workload across the state.
After considering all of the foregoing factors, we find it necessary to certify the need for 30 new circuit judges for Fiscal Year 2000-01, as follows: one additional circuit judge each for the First, Second, Third, Sixth, Seventh, Tenth, Fourteenth, Eighteenth, and Nineteenth judicial circuits; two additional circuit judges each for the Fourth, Fifth, Thirteenth, and Twentieth judicial circuits; three additional circuit judges for the Ninth, Eleventh, and Fifteenth judicial circuits; and four additional circuit judges for the Seventeenth Judicial Circuit.
We also find it necessary to certify the need for 13 new county judges for Fiscal Year 2000-01, as follows: one additional county judge each for Duval, Lake, Okaloosa, Pasco, Pinellas, Polk, and Sarasota counties; and two additional county judges each for Brevard, Broward, and Hillsborough counties.
Full funding of the requests certified in this opinion is absolutely essential if Florida's courts are to fulfill their constitutional mandate to resolve cases in a fair, impartial, and timely manner. Therefore, this Court encourages the Florida Legislature to authorize the judgeships certified herein, effective October 1, 2000.
It is so ordered.
SHAW, WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.