780 So.2d 906 (2001)
In re CERTIFICATION OF NEED FOR ADDITIONAL JUDGES.
No. SC01-331.
Supreme Court of Florida.
February 23, 2001.
WELLS, C.J.
Article V, section 9 of the Florida Constitution vests the Supreme Court of Florida with the responsibility for determining the need for increasing or decreasing the number of judges in the state courts. Pursuant to this authority, we have considered judgeship requests submitted by the lower courts, examined data concerning case filings and dispositions, and analyzed various judicial workload indicators. Based on our review, we conclude that there is a need for forty-four new judges in the trial courts and that there is no necessity for a change in the number of judges in the district courts of appeal.
The basic functions of the court-peacefully resolving disputes, upholding and interpreting the law, and protecting rights and liberties-are constitutional duties owed to the people of Florida under article V of the Florida Constitution. Adequate judges and additional court resources are essential in order for the courts to fulfill their essential functions. If there are not sufficient judges, supplemental resources, and court services to keep pace with the workload, it is the people seeking redress through the courts who are harmed because they are deprived of an opportunity to have their cases carefully decided in a timely manner.
The certification process is the mechanism that our constitution establishes for the systematic, uniform assessment of the judgeship needs of Florida's courts. Section 9 of article V requires the Supreme Court to submit findings and recommendations to the Legislature regarding the need for increasing or decreasing the number of judges and for redefining the jurisdictional boundaries of the appellate and circuit courts. The Legislature may accept or reject the certification recommendations in whole or in part. Certification is not a statement of what the Supreme Court wants; it is an analytical report of what the county, circuit, and district courts need in order to efficiently and effectively dispose of the cases brought before them. This determination of need is made absent fiscal concerns, which is within the purview of the Legislature.

District Courts of Appeal
Florida Rule of Judicial Administration 2.035(b)(2) sets forth the criteria for certifying the need for additional judges in the district courts of appeal. Based on these criteria, we do not certify the need for any additional district court judges or the necessity for a reduction in the current number of judicial positions. The number of judges in the district courts of appeal has remained constant since 1993, except for one additional judgeship that was added to the Fifth District Court of Appeal in 1999. The district courts did not request any additional judges this year.
Our data indicates that although our intermediate appellate courts are operating at close to capacity, they have continued to function effectively through the adoption of innovative case processing methods, strong staff support and law clerk assistance, and diligent case management. *907 The creative use of technology has also significantly enhanced their efforts to operate efficiently. We support the conscientious commitment of our district judges to improve court operations, and we urge the Legislature to continue to provide funding for the district courts so that they can perform at an optimum level.

Trial Courts
The quantitatively based criteria for certifying the need for judicial positions in the trial courts, which provided the foundation for the certification process until last year, are articulated in Florida Rule of Judicial Administration 2.035(1). These criteria were modified in response to a request from the Florida Legislature in proviso language of the 1998 General Appropriations Act that we employ a certification methodology which relies on case weights and calculations of available judge time to determine the need for additional trial judges. Pursuant to this request, we conducted an extensive development project to design and implement a weighted caseload system with the assistance of the National Center for State Courts and the active participation and advice of the Office of Program Policy Analysis and Government Accountability. The report of the Delphi Policy Committee was issued on February 1, 1999, and on February 29, 2000, we certified the need for forty-three additional trial judges based on calculations using the new Delphi method. See In re Certification of the Need for Additional Judges, 755 So.2d 79 (Fla.2000). That certification was not funded.
This year, the Court again relies on the results of the Delphi-based caseload weighting system and hereby certifies the need for forty-four additional trial court judgeships. Thirty of these are circuit court judgeships from fourteen judicial circuits, and fourteen are county court judgeships from eleven counties. The judgeships are allocated in the chart below.

---------------------------------------------------------------------------------
 Circuit Judgeships Judgeships County Judgeships Judgeships
 Court Requested Certified Court Requested Certified
---------------------------------------------------------------------------------
 First 1 1 Okaloosa 1 1
---------------------------------------------------------------------------------
 Second 2 1
---------------------------------------------------------------------------------
 Third 1 0 Columbia 1 0
---------------------------------------------------------------------------------
 Fourth 2 2 Duval 2 2
---------------------------------------------------------------------------------
 Fifth 3 2 Lake 1 0
 ---------------------------------------
 Marion 1 0
---------------------------------------------------------------------------------
 Sixth 2 2 Pasco 1 1
 ---------------------------------------
 Pinellas 1 1
---------------------------------------------------------------------------------
 Seventh 2 1
---------------------------------------------------------------------------------
 Eighth 0 0
---------------------------------------------------------------------------------
 Ninth 5 3 Orange 2 1
---------------------------------------------------------------------------------
 Tenth 3 2 Polk 1 1
---------------------------------------------------------------------------------
 Eleventh 3 3 Dade 1 0
---------------------------------------------------------------------------------
 Twelfth 0 0 Sarasota 1 1
---------------------------------------------------------------------------------
 Thirteenth 2 2 Hillsborough 2 2
---------------------------------------------------------------------------------
 Fourteenth 0 0
---------------------------------------------------------------------------------
 Fifteenth 3 2 Palm Beach 2 0
---------------------------------------------------------------------------------
 Sixteenth 0 0
---------------------------------------------------------------------------------
 Seventeenth 5 5 Broward 2 2
---------------------------------------------------------------------------------
 Eighteenth 4 2 Brevard 2 1
---------------------------------------------------------------------------------
 Nineteenth 0 0
---------------------------------------------------------------------------------
 Twentieth 2 2 Collier 1 0
 ---------------------------------------
 Lee 1 1
---------------------------------------------------------------------------------
 Totals 40 30 Total 23 14
---------------------------------------------------------------------------------

*908 The forty-four judgeships were calculated based upon the guidance enumerated in last year's opinion. We have applied the Delphi "reasonable caseload" standard developed by the Delphi Policy Committee in all case types except for dissolution, drug, eviction, and civil traffic infraction cases. In our view, these four case types still warrant additional study to merit the increase in case weights recommended by the Delphi Policy Committee. We also adjusted for differing jury trial rates in each circuit and county court. This adjustment was based upon readily available data and more accurately reflects the actual time spent in trial on average by Florida's trial court judges. As in the past, we considered the use and availability of county judges who routinely assist in handling important and time-sensitive circuit court matters. Finally, we have not certified more judgeships than were requested by each circuit court.
We continue to have confidence in the Delphi methodology[1] suggested by the Florida Legislature as a means of improving the certification process. As we explained in last year's certification opinion, the Delphi system assigns weights in minutes to different case types based on an assessment of the average amount of judicial time required for each type of case. This case weighting system differs from the certification method used prior to the 2000 legislative session, which did not distinguish between case types even though the amount of judicial time and resources required to dispose of different kinds of cases varies significantly. The primary benefit of case weighting is that it measures the differential requirements of judicial workload in different types of cases. As a result, we find that the current certification methodology using the case weighting system offers a more accurate and fair means of determining the courts' judicial requirements.
It is important to note that these case weights include the existing mix of supplemental resources in the trial courts, including senior judges, general masters and hearing officers, trial court staff attorneys, alternative dispute resolution, and case management support. These resources are vital to the continued operating effectiveness of Florida's trial courts. Failure to maintain supplemental resources at existing levels or to transfer appropriate resources to state funding from the counties under article V, section 14, as revised in 1998 (revision 7), mandates will result in an increased need for additional judges.
The Court has always been cautious in its approach to certifying the need for additional judges. This year is no exception. The aforementioned adjustments, which we adopted last year with the institution of Delphi methodology, are conservative and result in far fewer additional judgeships certified than a strict statistical application of the Delphi results might warrant. We have been conservative in our certification this year because of several factors. First, this is only the second year of applying Delphi methodology, and it is the first year it has been applied from the beginning of the annual certification process. As a result, we do not yet have an historical perspective from which to monitor the accuracy of our forecasts. In short, we believe that a new methodology warrants conservative application. Also, significant short-term increases and decreases were noted in select case types with higher weights such as capital cases and serious violent crimes. Presumably these can have a disparate impact on judicial *909 need over the short term that will not be reflected in a long-term trend. For these reasons, significant short-term increases in judicial workloads were discounted at this time. Finally, almost half of these significant changes from last year were noted in juvenile dependency cases, a division being studied by the Children's Court Improvement Committee, where significant resources are being allocated, and where pilot projects have been initiated to address workload needs. These issues are being studied further, but until results are available, we choose to err on the side of caution and certify fewer judgeships than the raw numbers warrant.
Although forty-four trial court judgeships are a substantially higher number than in many previous years, it is a onetime adjustment that is the result of the transition from a caseload-based system to a workload-based system using Delphi methodology. Over the past twenty years, since the inception of the original caseload-based system, anecdotal evidence and experience have suggested that judicial workload continues to increase. This assumption was validated by the Delphibased case weighting analysis. Judicial time that must be spent on each case differs depending on case type and frequently increases as the law becomes substantively and procedurally more complex. Consequently, an accurate measure of judicial workload must include an assessment of judge time required in individual cases and must differentiate between types of cases.
The caseload-based system used prior to last year did not address these factors; however, the case-weighting system that is the basis of our 2000-01 certification opinion does. The forty-four judgeships certified in this opinion mirror last year's certification of forty-three judgeships. If the 2000-01 certification had been funded, it is likely that the trial courts would not have required the judges we certify this year.
As suggested above, changes in the law continue to have workload implications for the courts. New legal requirements that are the result of statutory changes impact judicial caseloads by increasing not only the number of cases before the courts but the amount of time judges must spend on individual cases. This occurrence is illustrated by recent trends experienced in our dependency divisions. The revision of chapter 39 in 1997 and 1998 and the passage of the Kayla McKean Act in 1998 have resulted in a dramatic increase in the workload of our dependency system in the past three years. Our SRS data reveals that dependency case filings in response to these statutory changes increased approximately eighty-four percent between July 1997 and December 1999. Although all of the calendar year 2000 data is not yet available, the high volume of dependency case filings appears to have continued for most of that year.
Furthermore, the revisions to chapter 39 have dramatically impacted judicial workload in our dependency court divisions, both in the numbers of judicial hearings required and the length of time needed to properly conduct those proceedings. Specifically, the new statute expands statutory requirements for findings of fact at early stages of the proceedings and mandates more interim judicial reviews prior to the disposition of a case and subsequent to placement decisions. In addition, mandatory judicial reviews are no longer limited to children in foster care placement; they are also required for children placed in the home of their parents or with relatives under protective supervision of the Department of Children and Families. Additional participants such as foster parents have a right to be heard, thus lengthening the amount of time required for each hearing. The increased availability of treatment programs and the courts' ordering of additional child protection interventions have increased the number of individuals providing testimony at judicial reviews. Finally, the "one year to permanency" mandate of the federal Adoptions and Safe Families Act requires more rigorous judicial *910 review and more frequent judicial hearings. The result of these additional requirements is a substantial increase in the amount of judicial time and court resources necessary to handle the dependency caseload.
The significant increase in workload for juvenile dependency cases experienced over the last two years is forecast to continue. We reiterate our concern that our dependency divisions have the judicial and support resources necessary to adequately address the needs of dependent children. It is essential that our chief judges ensure sufficient allocation of judicial resources to our juvenile divisions when making division assignments. In addition, both the courts and the Legislature should review the results of the Dependency Pilot Projects currently operating in the Fifth, Tenth, and Seventeenth circuits and the ongoing work of the Dependency Court Improvement Program in order to examine the feasibility of further supplementing judicial resources with hearing officers, case managers, technology, and other court resources so that dependency matters can receive effective and timely judicial oversight and resolution.
The courts will continue to energetically examine court functions, processes, and performance in order to implement strategies to ensure that the judicial system is functioning with optimum efficiency and effectiveness and to reduce the need for additional judicial personnel. At present, the number of these activities underway throughout the courts system is unprecedented. Numerous court committees have been created to look at particular court operations, including the Children's Court Improvement Committee, the Family Courts Steering Committee, the Jury Innovations Commission, the Judicial Management Council, and the Trial Court Budget Commission. The Children's Court Improvement Committee is responsible for conducting both the Dependency Court Improvement Project and the Delinquency Court Improvement Project, and a delinquency court assessment is currently underway. The Family Courts Steering Committee has just completed an assessment of the family court process, is now conducting the Child Support Process Improvement Initiative, and has issued its report and recommendations for implementation of the Model Family Court, which is now the subject of pilot testing in several circuits. The Jury Innovations Commission is finalizing its report, and the Judicial Management Council is overseeing the work of both the Committee on Trial Court Performance and Accountability and the Committee on District Court of Appeal Performance and Accountability in determining how best to account for performance in the court setting. Finally, the Trial Court Budget Commission is working diligently to develop funding and budget guidance that will enable the trial courts to efficiently complete the transition to state funding as mandated by the recent revision to article V.
The courts have made great efforts to identify additional uses of technology in order to maximize efficient court operations. New initiatives include a focus on standardization of court data, implementation of case management systems, and the creation of a statewide court network. This latter innovation will enable judges and other court employees to communicate more effectively, provide access to legal research and other electronic resources, and allow for video teleconferencing capability. Further advances in technology are likewise being adopted by various jurisdictions to decrease cost and increase case processing efficiency.
Although the judicial branch already relies on supplemental resources to assist the trial court judiciary in performing their constitutional duties, we will continue to study the use of additional support to enhance court functions. The current level of supplemental support is factored into the case weights used in this year's forecasts. For example, nineteen of twenty judicial circuits use general masters or *911 hearing officers in more than one division of court. Mediation is utilized in more than 100,000 cases per year. Trial court staff attorneys in every circuit enhance the effective processing of cases. We will explore the further use of supplemental judicial resources such as hearing officers and masters, trial court staff attorneys, alternative dispute resolution, technology, and case management in order to maximize the efficient use of judges and enhance the quality of judicial decision-making. To that end, we will ask representatives of the Trial Court Budget Commission, the Court Statistics and Workload Committee, and the Committee on Trial Court Performance and Accountability, as well as our other committees, to recommend ways that the expanded use of these essential resources can further enhance the efficient use of judge time.
After reviewing the requests of the trial courts for forty additional circuit judges and twenty-three additional county judges in light of the foregoing considerations, we find it necessary to certify the need for thirty new circuit judges for the 2001-02 fiscal year as follows: five additional circuit judges for the Seventeenth Circuit; three additional circuit judges each for the Ninth and Eleventh circuits; two additional circuit judges each for the Fourth, Fifth, Sixth, Tenth, Thirteenth, Fifteenth, Eighteenth, and Twentieth circuits; and one additional circuit judge each for the First, Second, and Seventh circuits.
We also find it necessary to certify the need for fourteen new county court judges for fiscal year 2001-02 as follows: two additional county court judges each for Duval, Hillsborough, and Broward Counties, and one additional county court judge for Okaloosa, Pasco, Pinellas, Orange, Polk, Sarasota, Brevard, and Lee Counties.
We also urge the Legislature to support the funding requests for the courts, particularly with regard to those budget issues that will directly impact the efficient and effective use of judge time and court resources. Specifically, we emphasize the importance of additional trial court law clerks, who can significantly increase the productivity of the judges in the trial courts. In addition, we have requested an increase in funding for additional senior judge days, which will supplement and expand our available judges.
As we have discussed in this opinion, this certification is the result of a conservative application of our data findings, which have been based on weighted caseload methodology developed at the urging of the Legislature. It would be beneficial to the certification process for the Legislature to communicate with the Court regarding its continued commitment to the Delphi methodology. We have concluded that case weighting, as we have implemented it, does provide an improved method for determining judicial need and an objective criterion for evaluation of the need for additional judges. We recognize that the Legislature is the ultimate user of this methodology by its decision in respect to the needs certified. In view of the absence of funding for the 2000-01 certification, it would be beneficial for us to know if there is a continued legislative commitment to this methodology or if we need to address any concerns about the implementation of the methodology.
Full funding of the requests certified in this opinion is absolutely essential if Florida's courts are to fulfill their constitutional mandate to resolve cases in a fair, impartial, and timely manner. Therefore, this Court encourages the Florida Legislature to authorize the judgeships certified herein, effective October 1, 2001.
It is so ordered.
HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
SHAW, J., concurs in result only.
NOTES
[1] We do, though, continue with our same concerns, expressed in last year's opinion, as to the underweighting for juvenile divisions. In re Certification of Need, 755 So.2d at 81. We are steadfast in our belief that the judicial branch, together with the executive and legislative branches, must give priority to children.