863 So.2d 1191 (2003)
In re CERTIFICATION OF NEED FOR ADDITIONAL JUDGES.
No. SC03-2001.
Supreme Court of Florida.
December 18, 2003.
PER CURIAM.
Each year Florida's Constitution requires this Court to certify the need for new judges throughout the state using uniform standards.[1] This is the sole constitutional mechanism for ensuring that every Legislature has an accurate systemwide assessment of the judges needed to serve Florida's communities. The goal is to provide an effective and efficient justice system for Florida's growing population that will insure and protect the Rule of Law, the cornerstone of democracy in our state and our nation. The Rule of Law is the truest indicator of a healthy democracy. It is the idea that no person is greater than the law and that, under the law, no one is less important than any other. Key *1192 to the operation of the Rule of Law is a core belief: Justice must be timely dispensed to truly be justice. This in turn implies a judicial system with sufficient resources to make timeliness possible.

ASSESSMENT PROCESS
We continue to use established objective measures to determine judicial caseload and the corresponding need for additional judges. Our analysis in past yearsand again todayhas not only been conservative but has strongly emphasized the need to use less expensive alternatives and to maximize efficiency before seeking more judges. We have steadily moved toward court models that rely heavily on alternatives and skilled support staff.
At the trial level, these efficiencies have included hiring case managers who screen and organize cases to ensure that all legal matters in a case are fully in order before they go before a judge for a decision, guaranteeing the most efficient use of judge time.[2] Other efficiencies include the use of hearing officers and masters to hear matters such as disputes over child support and traffic tickets, and the use of mediation and other cost-saving measures, some discussed below, that have also reduced the need for certifying even more judges. All of these measures ensure that preliminary organizational and ministerial work is done by administrative staff, freeing trial judges to do their essential and unique taskadjudication.
In the district courts of appeal, these models have included adding staff attorneys to conduct important research and to do preliminary screening and analysis of cases,[3] thus freeing the judges to devote their important and more costly time to their most crucial dutydeciding appeals. And, as will be discussed more fully below, these efforts are highlighted by a voluntary decision by the district court judges to increase their own recommended caseload by forty percent, in lieu of adding more judges. This decision reflects not only the dedication of these judges, but also the efficiencies they have achieved through the use of enhanced judicial staff.
At the trial level, this Court has cooperated with the Legislature by adopting a trial-court certification system that the Legislature originally suggested, the "Weighted Caseload System" discussed more fully below.[4] We also stress that our certification is not a statement of what Florida State Courts subjectively want. Rather, it is a statement of what the State Courts objectively need to meet their workload, using accepted standards of *1193 measurement. In order to ensure that the certification is as objective as possible, the constitutional framers reposed this duty in the Supreme Court, which itself neither benefits nor loses by the Legislature's final decision on the issue.
We also must acknowledge the very positive efforts of the Legislature in responding to the needs of the judicial branch. We understand the competing priorities lawmakers face in every session. Despite these pressures, the Legislature still has funded a number of new judgeships at the trial and appellate levels in recent years. It has also responded favorably to requests for additional resources that have greatly improved the efficiency of our courts. Florida legislators and their leadership deserve great credit for helping ensure that the Third Branch has been capable of providing a high standard of service to the communities of Florida. Our task today is to determine what is needed to maintain this standard of service to the people.
In summary, to fulfill our constitutional mandate we have considered judgeship requests submitted by Florida's five appellate districts and twenty judicial circuits. We have examined the requests for new trial judges using the Weighted Caseload System and have analyzed various other judicial workload indicators including the appellate judges' willingness to accept a higher workload. Based on our review of these factors, we conclude that there is a need for four new judges in the district courts of appeal, fifty-one circuit judges, and thirty-three county judges.[5]

The State of Florida's Third Branch of Government
Florida's State Courts are nearing a historic crossroad in the months aheadone that will determine the health and stability of our courts for decades to come. This is a result of actions taken by our citizens. In 1998, the same year that the Legislature first asked us to use the Weighted Caseload System for trial-court certification, the voters of this state approved Revision 7 to the judicial article of the state Constitution. This revision shifts a greater portion of the costs of trial courts from county commission budgets to the state budget by next July 1.
There is much at stake for the residents of Florida as we make this shift to unified state funding of the courts. The most significant challenge is to ensure that the Rule of Law is not compromised in Florida's communities, and, critically, that the level of services provided in Florida's twenty judicial circuits not be reduced on July 1, 2004.
Observant and respected groups like the Florida Council of 100 have expressed concern that Florida's court system has been under-resourced.[6] As the Legislature assumes greater responsibility for the state's courts, legislative support in providing adequate judicial resources and operating costs is vital to maintain the existing high quality of justice we have provided, and indeed that our citizens expect and deserve. We are fortunate that the Legislature has a history over the last decade of providing many of the resources courts need.
Under the federal system of government in the United States, our state courts are the primary vehicle for providing the Rule of Law to our people. As has often been noted, state courts account for well more than ninety-five percent of all judicial activity in the United States. State courts *1194 such as those in Florida protect democracy by upholding the law, ensuring individual rights and liberties, enforcing public order, and peacefully resolving disputes. Courts maintain public safety, settle costly business disputes, and protect our most vulnerable citizens. Of course, judges are crucial to the operation of this system. Their work helps our citizens and businesses resolve issues fairly and peaceably, in a way that promotes the well-being of all.
This Court fully understands the competing funding priorities that confront the Legislature. However, we also recognize the significant need for adequate funding of Florida's Third Branch of government in the face of unprecedented growth in this, the nation's fourth largest state. Just as growth places increasing demands on other public services, it has a direct relationship to the need for additional judicial resources in Florida's communities. Backlogs of cases would become inevitable without enough judges to preside over and dispose of cases, and without sufficient operating costs and resources to support them. In sum, justice itself would be delayed. Preventing this from happening deserves some priority. Without adequate funding for judges and other essential elements, the effective and efficient operation of the Florida State Courts System will be jeopardized. If adequate resources are not provided, the courts would be required to shift resources from civil proceedings to criminal matters, thereby unavoidably delaying cases involving mortgage foreclosures, landlord-tenant matters, contract disputes, and other civil concerns that are essential to flourishing business operations and a prosperous economy in this state and to the well-being of its families.
Courts in other states have suffered devastating cuts in recent years, and their experiences demonstrate that inadequate funding can gravely impair court operations. In New Hampshire, jury trials were suspended for two months in 2002 and for three months in 2003. In Colorado, courthouses were recently forced to close one week per month, and court proceedings in Oregon were suspended one day per week last year. It is critical that Florida avoid similar harm to its justice system, and the fact that we have avoided problems as serious as these is largely due to the Legislature's efforts.
Florida's judiciary has long been regarded as one of the finest in the nation. In the years leading up to implementation of Revision 7, we have achieved this high level of service and national reputation only with the combined financial support of both the Legislature and Florida's counties. Yet, Florida's budget for the Third Branch has consistently been well less than one percent of the state's budget. In short, while bearing an enormous caseload, Florida's courts have provided a genuine bargain to the people of Florida. Our judiciary's continuing tradition of excellence will now depend on whether its current standards continue to be funded. We are confident the Legislature will continue to provide these resources.

TRIAL COURTS
We begin our analysis with the trial courts. In recent years, we have used the Weighted Caseload System in evaluating the requests for new judges made by the chief judges of the trial courts. Judicial need remains high for two primary reasons: first, the lack of funding for previously certified judgeships and, second, overall caseload increases. Since our first judicial certification using the Weighted Caseload System,[7] the Legislature has authorized about one-fourth of the trial court judges certified as needed.
*1195 Each day the circuit and county judges of this state dispense justice in an endless variety of ways. In many instances, their workload is well beyond capacity. This workload demand, if left unaddressed, will jeopardize the Rule of Law. It will result in delayed justice because it will slow down and affect the quality of the judges' work. Much of the increase in workload is attributable to changing demographics. As Florida's resident population grows, so does its judicial need. Chief Judge Hayes of the Twentieth Judicial Circuit noted in his request to this Court:
[I]f this need goes unmet, it would undoubtedly have a deleterious effect upon the administration of justice in our circuit and our ability to guarantee to the citizens of our circuit their right of access to the court as guaranteed by Article I, section 21 of the Florida Constitution.
We agree with this observation and its application to the current situation throughout Florida.
Florida is unique in several ways. First is the fact that we have experienced so much growth that we rapidly have become the nation's fourth most populous state. Florida has rapidly replaced New York as the gateway to immigration. Second is the fact that our population swells during the winter months and produces increased activity of all kinds. Unfortunately, increased judicial activity goes hand in hand with this growth. Third, the ever-changing demographics of Florida affect our judiciary and strain its capacity in many other ways, some subtle, some obvious to all. For example, the significant growth of non-English-speaking residents increases the need for court interpreters. Likewise, the aging of Florida's population has resulted in an increase in guardianship and related probate cases. Further, population growth and geographic considerations in multi-county circuits all have placed additional workload demands on the circuits.
The chief judges of the various circuit courts also have advised us of other factors that influence the circuit court workload. These include such things as the presence of universities inside a court's jurisdiction, one-time or annual events that can significantly increase criminal or civil caseloads, and the proximity of theme parks and beaches. Other factors that influence workload include the distance between courthouses inside a county or circuit, the presence of adult and juvenile correctional facilities, state attorney filing practices, and the practices of others involved in the legal process. Still other factors may not be readily apparent to the lay observer. For example, the presence of criminal and juvenile gangs inside a circuit also can increase judicial workload.
The Weighted Caseload method of certification was urged upon the Court in 1998 through chapter 98-422, section 7, Laws of Florida, which the Court accepted, implemented, and began using in 2000.[8] For that reason, it is the product of a partnership between the Legislature and the courts in fulfilling their mutual constitutional obligation to provide justice to the people. The Legislature and its advisory bodies settled upon this method because of its objectivity and its widespread acceptance.
The Weighted Caseload System grew out of similar well-established methods of forecasting. They originated with Defense Department work by the Rand Corporation and have since been widely adopted by the private sector. As used in certification, the Weighted Caseload System analyzes Florida's trial-court caseload statistics according to their complexity and the resources likely to be needed. Simpler kinds of cases receive less weight than *1196 more complicated ones. The history underlying this system of analysis is detailed on the Court's website. See National Center for State Courts, Florida Delphi-based Weighted Caseload Project: Executive Summary (2000), available at http://www.flcourts.org/pubinfo/highprofile/certification.html.
Going hand-in-glove with the Weighted Caseload System is a growing reliance on less expensive ways of resolving legal cases in Florida. Courts here and throughout the nation have steadily moved toward the use of specialized staff and alternative forms of resolving legal issues that are more efficient. The importance of these resources in the present context stems from the fact that the Weighted Caseload System takes them into account in certifying the need for judges. In other words, the number of judges that otherwise would be necessary is reduced by these cost-saving measures.
Analysis of caseloads, however, reveals yet another factor driving the caseload burden higher: There are significant increases in several of the specific circuit court case types that are more labor intensive and thus more heavily weighted. Most notable are cases involving contracts and real property, professional malpractice and product liability, child support, and other domestic relations matters. Domestic relations cases include adoption, questions of paternity, changes of custody, and so forth. From fiscal year 1999-2000 to 2001-2002, contracts and real property filings increased approximately eighteen percent. For this same time period, professional malpractice and product liability, child support, and other domestic relations filings increased by approximately thirty percent. Moreover, workload related to domestic violence, repeat violence, and substance abuse cases, and the volume and complexity of serious felonies and postconviction proceedings are all impacting circuit court caseloads.
Overall, county court filings, excluding civil traffic infractions, have increased seven percent from fiscal year 1999-2000 to fiscal year 2001-2002, and are projected to grow at a similar rate for the next few years. Total county civil filings, excluding civil traffic infractions, increased by more than twenty-three percent from fiscal year 1999-2000 to fiscal year 2001-2002. They are projected to increase further approximately twenty-two percent from fiscal year 2001-2002 to fiscal year 2002-2003.[9]
For those courts requesting county judgeships, one of the most significant increases at the county court level from fiscal year 1999-2000 to fiscal year 2001-2002 occurred in civil case filings. Under the Weighted Caseload System, this case type is the second highest case weight at the county court level. It thus represents a significant proportion of the workload. Small claims filings for those courts requesting county judgeships have increased approximately forty-seven percent from fiscal year 1999-2000 to fiscal year 2001-2002. Small claims are generally filed by unrepresented litigants who are often unfamiliar with court rules and procedures, and thus can require a considerable amount of judge time. Other factors impacting the workload of county courts include large increases in population, the necessity of judges and personnel traveling between branch courthouses in urban counties, the creation of branch courthouses in urban counties,[10] and a lack of *1197 traffic infraction hearing officers.[11] The latter can complete a far higher volume of work, and they can do so at far less cost than if these infraction cases must be handled solely by a judge. In their absence, judges are required to fill the void.
We recognize and are appreciative of the fact that the Legislature already has begun its work on Revision 7. Earlier this year it passed chapter 2003-402, Laws of Florida, which recognized those resources most critical to daily court operations. As noted above, these resources are in place to safeguard Floridians' constitutional rights of due process, equal protection, and access to courts; to assist judges with their caseloads; and to ensure the efficient and effective operation of the trial courts. It is essential that there be no diminution in these critical resources and that they be appropriately funded. Failure to maintain funding for these existing resources in the trial courts, many heretofore paid by county government, would greatly disrupt the operations of the trial courts. The public's access to their courts would be impaired, and delay would become inevitable. Resources such as masters, hearing officers, staff attorneys, mediation, court administration, and case managers all play a pivotal role in ensuring access and the timely disposition of cases.
It is important to stress again that the Weighted Caseload System, as established by the joint efforts of the Legislature and this Court, factors these existing supplemental resources into its analysis. Assuredly, the case weights and the corresponding need for judges would be much higher had those resources not been considered in the methodology. Many chief judges have reported to us the positive effects of these resources in their circuits.
Yet, their impact also can be estimated by comparing the efficiency of Florida's judiciary with the national norm. Florida's circuit judges handle thirty-one percent more filings than the national average.[12] That is one measure of how efficient our courts are. The resources currently in place enable Florida judges to dispose of this significant caseload with minimal delay. Moreover, a key aggregate measure of a court's efficiency and timeliness is its "clearance rate," which measures a court's ability to resolve its pending caseload in a timely manner. Florida's clearance rates remain consistently high across all judicial circuits. This is due in large part to the availability of supplemental resources.
Several circuit court chief judges have expressed concern to this Court that judicial workload has been increased by the elimination of court staff in the budget reductions made during the 2003 legislative session. Among the more serious cuts were the elimination of the juvenile alternative sanctions coordinators[13] and five model dependency courts throughout the state. The juvenile alternative sanctions coordinators were largely responsible for providing judges with effective and efficient alternative sanctions and other disposition *1198 techniques in delinquency proceedings. A prime example was the Juvenile Arbitration Program in the Sixth Judicial Circuit.[14] Circuits with model dependency court projects utilized general masters and case managers to assist judges who hear child abuse and neglect proceedings. They policed cases to make sure that the time frames and judicial review requirements of chapter 39, Florida Statutes, were met. The elimination of all of these case managers and general masters effectively required circuit judges in those circuits to absorb this additional workload themselves.
Experience demonstrates that disposition times are typically faster because of supplemental resources. For example, the use of case managers in St. Johns County has reduced the disposition time of family law cases from 147 to 99 days.[15] Cost is also an important consideration when discussing judicial and other court resources. In the efficient system now in place, the State Courts System recognizes that judges' time is valuable and should be reserved for use where most essential. Indeed, in a modern court system, it is both cost effective and prudent to provide judges with sufficient supplemental resources such as those discussed above to perform ministerial, administrative, or research duties that assist in deciding cases. Simply put, it is far more cost effective to maintain our existing structure with its efficient utilization of supplemental resources than to either pay for a significantly higher number of judges or, conversely, to suffer the adverse consequences of delay and backlog if new judgeships are not sufficiently funded.
Given the known impact of the loss of staff during the current fiscal year, the Court is concerned about further loss of such cost-efficient and effective resources. As we noted earlier, these supplemental resources have substantially improved judicial efficiency. Their loss would undermine the assumptions upon which the current Weighted Caseload System is based. This in turn likely would result in the return to a system of certification that requires even more trial court judgeships.
In the past, chief judges have many times declined to request the number of judges for their circuits for which they were eligible under the Weighted Caseload System. However, from the fiscal year 2003-2004 certification process to the 2004-2005 certification process, the number of judges requested by the trial court chief judges significantly increased from thirty-three circuit judges and twenty-three county judges last year to fifty-four circuit judges and thirty-eight county judges this year. These increased requests represent a thirteen percent higher request relative to the net judicial need. It is the Court's understanding that the chief judges in the trial courts have abandoned their previous conservative stance and requested a higher proportion of the calculated judicial need for their circuits due to their concerns arising out of the sharp budget cuts in 2003 and their concern that there will not be proper funding for the trial courts in the future under Revision 7.
In addition, the increase in additional judges requested by the chief judges of the trial courts is directly related to the increase in judicial net need from sixty full-time equivalent positions (FTE) to seventy-eight FTE in the circuit courts and thirty-five FTE to forty-six FTE in the *1199 county courts. In addition to normal growth in workload as a result of the continuing growth in Florida's population, such a growth in net judicial need is due to increases in higher weighted case types, as discussed in this opinion.
After reviewing the requests of the trial courts, and in light of the foregoing considerations, we certify the need for fifty-one new circuit court judges for fiscal 2004-2005 as follows:
 Six additional circuit judges each for the Fifth, Eleventh, and Seventeenth circuits;
 Five additional circuit judges for the Ninth Circuit;
 Four additional circuit judges for the Thirteenth Circuit;
 Three additional circuit judges each for the First, Sixth, Fifteenth, Nineteenth, and Twentieth circuits;
 Two additional circuit judges each for the Fourth, Seventh, and Tenth circuits; and
 One additional circuit judge each for the Third, Eighth, and Fourteenth circuits.
Further, after reviewing the requests of the trial courts and in light of the foregoing considerations, we certify the need for thirty-three new county court judges for fiscal year 2004-2005 as follows:
 Six additional county judges for Broward County;
 Four additional county judges each for Orange and Hillsborough counties;
 Three additional county judges for Palm Beach County;
 Two additional judges for Pinellas and Brevard counties; and
 One additional county judge each for Columbia, Duval, Lake, Marion, Pasco, Volusia, Dade, Bay, Seminole, Martin, St. Lucie, and Collier counties.
We decline to certify the remaining eight requests. The requests and certifications of circuit and county judges are illustrated in the following table.[16]

*1200
 Judgeships Judgeships Judgeships Judgeships
Circuit Court Requested Certified County Court Requested Certified
First 3 3
Second 1 0
Third 1 1 Columbia 1 1
Fourth 2 2 Duval 1 1
 Hernando 1 0
Fifth 6 6 Lake 1 1
 Marion 2 1
 Pasco 2 1
Sixth 4 3
 Pinellas 2 2
Seventh 2 2 Volusia 1 1
Eighth 1 1
Ninth 5 5 Orange 4 4
Tenth 2 2
Eleventh 6 6 Dade 3 1
Twelfth 0 0
Thirteenth 4 4 Hillsborough 4 4
Fourteenth 1 1 Bay 1 1
Fifteenth 3 3 Palm Beach 3 3
Sixteenth 0 0
Seventeenth 6 6 Broward 6 6
 Brevard 2 2
Eighteenth 1 0
 Seminole 1 1
 Martin 1 1
Nineteenth 3 3
 St. Lucie 1 1
Twentieth 3 3 Collier 1 1
Total 54 51 Total 38 33

DISTRICT COURTS OF APPEAL
The district court of appeal workload has increased steadily over the last ten years.[17] Yet, the districts have been measured and modest in their requests for new judgeships. They have chosen to employ a *1201 variety of less expensive means of addressing increased workload. These have included the development of case management systems, the increased use of senior judge time,[18] the increased use of information technology to assist with legal research, and the expanded use of staff attorneys. In spite of these efforts, judicial workload in the districts is becoming too great.
In the face of this workload, the district court of appeal judges have voluntarily agreed to carry even higher caseloads before they seek additional judges on their courts. In 2002, this Court directed the Commission on District Court of Appeal Performance and Accountability to conduct an in-depth study of workload and related policy issues for the district courts of appeal. That Commission, with the support of district court of appeal judges, has recommended the adoption of a new and substantially increased appellate court workload standard350 primary assignment case filings per judge. This recommended standard is 100 more than the current standard of 250 case filings per judge as identified in rule 2.035(b)(2), Florida Rules of Judicial Administration. It thus requires appellate judges to shoulder a caseload burden forty percent greater than before in determining the need for additional judges.
This new standard further underscores the benefits of cost-saving measures now being used in the courts. The infusion of support staff and other resources over the last decade has enabled the district courts to keep pace with rising workload increases by achieving greater efficiency. While we have not yet formally amended our rules to incorporate this higher standard, we have concluded that this higher standard should be applied to this year's certification.
Even under this increased standard, however, it is apparent that the Second, Fourth, and Fifth districts now require additional judges. In the district courts of appeal statewide, there was an average of approximately 389 case filings per judge in fiscal year 2002-2003. However, the Fourth and Fifth districts experienced approximately 423 and 420 case filings per judge, respectively, for the same time period. In fiscal year 2002-2003, approximately 430 cases per judge were filed in the Second District. Despite this significant increase in burden, the number of judges in the district courts has remained constant since the 1999[19] legislative session, although the number of annual filings has risen steadily. The 24,114 cases filed in the district courts in fiscal year 2002 2003 is an increase of approximately eleven percent over the 21,679 filings for fiscal year 1999-2000.

Fifth District
The Fifth District is projected to have the highest number of filings per judge, approximately 446, of any of the district courts for fiscal year 2004-2005. Traditionally, the Fifth District has resisted adding new judgeships to avoid the costs and other burdens associated with creating larger courts. However, current workload necessitates the request for an additional judgeship. The chief judge of the Fifth District notes that even if that court is fortunate enough to receive a new judgeship, it will still exceed the new filings threshold standard of 350 by more than fifty filings per judge.

*1202 Second District
Since the 1993 Legislative Session, when the Second District was last authorized two additional judgeships, filings have increased by approximately thirty-two percent. During that time, the Legislature authorized thirty-one additional circuit judges for the Second District but no new district judges. The Second District remains the largest district in geographic size and now serves over 4.6 million residentsa more than twenty-two percent increase since fiscal year 1992-1993.[20] The current ratio of circuit judges to district judges in the Second District is ten to one and there are 142 circuit judges in the district, more than any other district.
These factors have begun to take their toll on the Second District's ability to keep pace with workload and maintain quality. As stated by Chief Judge Altenbernd in his letter of judicial needs, addressed to this Court:
We have reviewed all of our procedures and implemented steps to prioritize the timely review of cases. I am personally very proud of the extraordinary effort of our dedicated staff. They have served above and beyond all realistic expectations to assure that all litigants receive a timely appeal. But this court simply cannot continue to operate at its current level of productivity without suffering a demoralized staff. Even more important, we cannot continue to dispose of cases at this rate without risking the quality of the review received by the litigants.
Under these circumstances, this Court is concerned that timely, high-quality appellate review is at risk of being compromised due to a lack of judges to handle the high workload.

Fourth District
Similarly, the Fourth District continues to experience significant growth in population, circuit judgeships, the number of practicing attorneys, and overall workload. The Fourth District was last authorized an additional judgeship during the 1988 Legislative Session, nearly sixteen years ago. The district's population currently exceeds three million people, which is more than a twenty-seven percent increase since fiscal year 1992-1993. Indeed, the three judicial circuits that constitute the Fourth District have some of the largest and fastest growing jurisdictions in Florida including Broward, Palm Beach, Martin, and St. Lucie counties. Since the 1993 Legislative Session, the Legislature has authorized sixteen additional circuit judges for the Fourth District. This represents an increase of approximately eighteen percent. The current ratio of circuit judges to district judges for the Fourth District is eight and one-half to one.
The chief judge of the Fourth District also notes that increases in the number of practicing attorneys, general litigiousness, and numerous filings within each case impact the district's judicial workload. Further, as with Chief Judge Altenbernd in his letter of judicial needs, Chief Judge Farmer cautioned that "we have significant concerns about our ability to continue the level of quality judicial performance the judges of this court have demonstrated since the last increase in judges." Like the Second, the Fourth District is concerned that excessive workload moves the courts perilously close to being unable to devote the necessary time to each case, potentially compromising effective appellate review.

*1203 District Court Certification
Given the high caseload, increases in population, and growth in the circuit courts within the Second, Fourth, and Fifth Districts, it is evident that efficiency measures implemented by them are no longer adequate to offset the need for additional judgeships.
Accordingly, utilizing the new and higher standard recommended by the District Court of Appeal judges, we certify the need for two additional district court judges for the Second District and one each for the Fourth and Fifth districts. This certification renews the requests for additional judgeships for the Second and Fourth Districts that were certified in last year's opinion,[21] but not authorized by the Legislature. The following table illustrates the requests and certifications of additional judges for the district courts of appeal.

District Court Certification Table

District Court Judgeships Judgeships
 of Appeal Requested Certified
First 0 0
Second 2 2
Third 0 0
Fourth 1 1
Fifth 1 1
Totals 4 4

Conclusion
Florida's State Courts System is at a critical juncture. Much is at stake. This is a time of great risk and great opportunity. We must take every step to minimize the risk and invoke every measure to ensure that we do not miss the opportunity to maintain a fair and effective justice system worthy of public trust throughout Florida. This opinion fulfills our constitutional mandate to certify those additional judgeships needed to maintain the fair and timely administration of justice in Florida's Court System.
We are confident that the Governor and the Legislature will respond to our concerns both as to judicial resources and the transition to more state funding of the trial courts mandated by Revision 7. This will ensure that the courts continue to provide the citizens of Florida a justice system able to administer the Rule of Law-one that our nation and our state can continue to view as a model. We pledge our cooperation in every way to provide information and assistance to our coordinate branches of government to assure the continuation of effective and efficient judicial services to the people of Florida.
It is so ordered.
*1204 ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Article V, section 9, Florida Constitution, provides:

Determination of number of judges.-The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need. Upon receipt of such certificate, the legislature, at the next regular session, shall consider the findings and recommendations and may reject the recommendations or by law implement the recommendations in whole or in part; provided the legislature may create more judicial offices than are recommended by the supreme court or may decrease the number of judicial offices by a greater number than recommended by the court only upon a finding of two-thirds of the membership of both houses of the legislature that such a need exists. A decrease in the number of judges shall be effective only after the expiration of a term. If the supreme court fails to make findings as provided above when need exists, the legislature may by concurrent resolution request the court to certify its findings and recommendations and upon the failure of the court to certify its findings for nine consecutive months, the legislature may, upon a finding of two-thirds of the membership of both houses of the legislature that a need exists, increase or decrease the number of judges or increase, decrease or redefine appellate districts and judicial circuits.
[2] Case managers conserve judicial time by ensuring timely and efficient case processing. They perform initial reviews and evaluations, including screening cases to make sure they are in the proper procedural posture for judicial action. Case managers also monitor the progress of cases assigned them, schedule significant events in the cycle of the case, and take other necessary actions to expedite the final decision. Their exercise of control over case flow lets judges focus more fully on complex legal issues. They thus enable judges to devote their special expertise to presiding over hearings, trials, and post-trial matters. Case managers police the technical process of bringing cases to resolution before the judge. Though this technical process can be complex and time-consuming, it largely involves work that a skilled case manager can perform with minimum judicial supervision. This bifurcation of work results in greater efficiency: Judges are free to do what only they can do, and case managers largely handle the rest.
[3] An analogous function is served by the Supreme Court's Central Staff Attorneys. They have developed special skills that greatly increase the Justices' ability to manage an ever-rising caseload effectively and with greater efficiency.
[4] The Weighted Caseload System is relevant only to trial court certification, so it will be described more fully in the section below dealing with that specific subject.
[5] We decline to certify three of the requested circuit judgeships and five of the requested county judgeships.
[6] See The Florida Council of 100, Committee on the Justice System, Progress 4 Partnership (1995).
[7] See In re Certification of the Need for Additional Judges, 755 So.2d 79 (Fla.2000).
[8] See In re Certification of Need, 755 So.2d at 80.
[9] Data for fiscal year 2002-2003 are not yet finalized.
[10] The issue of court access continues to be a primary concern for chief judges and this Court. The building of branch courthouses in urban settings or large counties helps to alleviate the burden of long commutes to courthouses in county seat locations and provide ready court access to citizens. A recent example of this is the new West-Hialeah branch courthouse in Miami-Dade County.
[11] The availability of traffic infraction hearing officers as a supplemental resource in county court has proven to be very successful in addressing judicial workload in those counties fortunate enough to receive them. Unfortunately, some counties continue to experience heavy workload (e.g., Columbia County) with no traffic infraction hearing officer to alleviate this burden. This Court remains sensitive to those individual local circumstances and has given them due consideration in this opinion.
[12] See National Center for State Courts, 2002 State Court Caseload Statistics (2003).
[13] Twenty full time equivalent positions were eliminated, one for each judicial circuit.
[14] This program was designed to divert first-time juvenile offenders from the traditional disposition process.
[15] See Judicial Need Application for the Seventh Judicial Circuit (on file with the Office of the State Courts Administrator, Supreme Court Building, Tallahassee, Fla.).
[16] If the full complement of judges requested in certifications since 2000 had been funded, the present need for additional trial judges would be much less. Once the current "deficit gap" is addressed, the judgeships certified should reflect a more moderate increase in judicial need in the future.
[17] The 24,114 cases filed in the district courts in fiscal year 2002-2003 represent a thirty percent increase over the 18,549 filings in fiscal year 1992-1993.
[18] Senior judges are retired judges who, under the state Constitution, are eligible to serve as temporary judges. They are far less expensive to fund than traditional judgeships. Senior judges are paid at a fixed rate only for the days they actually serve.
[19] The Fifth District Court of Appeal received an additional judgeship in 1999.
[20] The source for population data used in this opinion is the Florida Legislature's Office of Economic and Demographic Research. The most recent population data available was produced for a Demographic Estimating Conference in September 2003.
[21] See In re Certification of Need for Additional Judges, 842 So.2d 100 (Fla.2003).