806 So.2d 446 (2002)
In re CERTIFICATION OF NEED FOR ADDITIONAL JUDGES.
No. SC01-2703.
Supreme Court of Florida.
January 3, 2002.
PER CURIAM.
Article V, section 9 of the Florida Constitution requires this Court to determine, prior to each year's regular legislative session, the need for increasing or decreasing the number of state judges and the need for redefining the jurisdictional boundaries of the district and circuit courts.[1] The certification process is the mechanism that our Constitution establishes for the systematic, uniform assessment of the courts' judgeship needs.
*447 Pursuant to this constitutional mandate, we have considered judgeship requests submitted by the lower courts, examined case filing and disposition data, and analyzed various judicial workload indicators. Based on our review of these factors, conducted pursuant to uniform criteria established by rule,[2] we conclude that there is a need for two additional judges in the district courts of appeal and forty-seven additional judges in the trial courts.

District Courts of Appeal
Using the criteria for certifying the need for additional district court judges set forth in Florida Rule of Judicial Administration 2.035(b)(2), we certify the need for an additional district court judge for the Second District and one for the Fourth District. Except for the addition of one judgeship in the Fifth District in 1999, the number of judges in the district courts have remained constant since 1993. Since 1993, the number of annual filings in each district court has risen steadily. The total of 22,906 cases filed in the district courts in 2000 is an increase of twenty-four percent over the filings for 1993.
The district courts use an array of strategies to address increased workload pressures. These courts have streamlined internal operating procedures, established central legal research staff to handle selected matters, and assigned senior (retired) judges to hear appeals on a temporary basis. Even though the district courts continue to develop innovative approaches to efficiently and fairly hear cases, the Second and Fourth Districts now require an additional judge to operate efficiently.[3]
The Second District last received an additional judge in 1993. Since that time, the Legislature has authorized nineteen additional circuit judges within the district. The ratio of circuit judges to district judges in the Second District is 9.7 to 1 the second highest ratio in the state. The district's population exceeds four million people, nearly a thirteen percent increase since 1990. In 2000, the Second District averaged 398 case filings and 251 dispositions per judge after submission on the merits. The statewide average for 2000 was 370 case filings and 233 dispositions per judge after submission on the merits.
The Fourth District last received additional judges in 1988. Caseloads in that *448 district have steadily increased from 3507 in 1990 to 4751 in 2000. The increase from 292 to 396 case filings per judge represents an increase of thirty-five and six-tenths percent. Dispositions after submission on the merits have also increased during the same period from 2081 to 2769, representing a thirty-four and three-tenths percent increase of 172 to 231 dispositions per judge after submission on the merits.
Like other districts, the Fourth District initiated steps during the 1990s to minimize the need for additional judges through the implementation of innovative approaches to increase efficiency. A standing committee on case management has been active for over ten years. The district continues to rely on the use of senior judges. Moreover, enhanced information technology aids legal research and court administration and has reduced the need for additional personnel. There has also been an expanded use of central staff attorneys and their responsibilities to delay the need for additional judges. However, given the high caseload, increases in population, and growth in the circuit courts within the district, these efficiency measures are no longer adequate to offset the need for an additional judge.
The following table illustrates the requests and certificate of additional judges for the Second and Fourth Districts.

 District Court Certification Table
District Court Judgeships Judgeships
 of Appeal Requested Certified
First 0 0
Second 1 1
Third 0 0
Fourth 1 1
Fifth 0 0
Totals 2 2

Trial Courts
In 2001, we certified the need for an additional forty-four judgeships. See In re Certification of the Need for Additional Judges, 780 So.2d 906 (Fla.2001). Of the forty-four judgeships requested, twenty-six were funded: fifteen for circuit courts and eleven for county courts.[4] However, based upon the Delphi methodology, we report to the Legislature that the funding of those judgeships was insufficient to address the overall "reasonable net need." The quantitatively based criteria for certifying the need for judicial positions in the trial courts, which provided the foundation for the certification process until 1999, are articulated in Florida Rule of Judicial Administration 2.035(1). These criteria were modified in response to a request from the Florida Legislature in proviso language of the 1998 General Appropriations Act that we employ a certification methodology which relies on case weights and calculations of available judge time to determine the need for additional trial judges. Pursuant to this request, we conducted an extensive development project to design and implement a weighted caseload system with the assistance of the National Center for State Courts and the active participation and advice of the Office of Program Policy Analysis and Government Accountability. The report of the Delphi Policy Committee was issued on February 1, 1999, and on February 29, 2000, we certified the need for forty-three additional trial judges based on calculations using the new Delphi method. See In re Certification of the Need for Additional Judges, 755 So.2d 79 (Fla.2000). That certification was not funded, followed by the reduced number funded for the judgeships which *449 took effect January 1, 2002. That need persists, as reflected in the most recent Delphi-based calculations.
This year, the Court again followed the legislative direction in having a study using the Delphi-based workload weighting system. The result of that Delphi study has been considered by the chief judges of the circuit courts and by this Court, and based thereon, we certify the need for forty-seven additional trial court judgeships: thirty-four circuit court judgeships from thirteen judicial circuits, and thirteen county court judgeships from eleven counties.
The Delphi-based case weighting analysis addresses the differences in the amount of time that must be spent on each case depending on the case type.[5] We have applied the Delphi "reasonable workload" standard in all case types[6] except for cases related to dissolutions of marriage,[7] drug offenses,[8] evictions, and civil traffic infractions.[9] We have also adjusted for *450 several factors that impact judicial workload, including differing jury trial rates in each circuit and county court and the number of judges actually requested by each circuit after careful consideration by the chief judge of the circuit.
This certification of judicial need results in far fewer additional judgeships certified than a strict statistical application of the Delphi results might warrant. Indeed, the "reasonable net need" established by the Delphi methodology, without the adjustments discussed above, indicates a need of sixty-seven and five-tenths judges in the circuit courts and twenty-seven and six-tenths judges in the county courts. The requests and certifications are illustrated in the following table.

 Trial Court Certification Table
Circuit Judgeships Judgeships Judgeships Judgeships
Court Requested Certified County Court Requested Certified
First 0 0
Second 0 0
Third 0 0 Columbia 1 0
Fourth 0 0 Duval 1 1
Fifth 4 4 Lake 1 1
 Marion 1 0
Sixth 2 2
Seventh 2 2
Eighth 1 1
Ninth 3 3 Orange 2 2
Tenth 2 2 Highlands 1 0
Eleventh 5 5
Twelfth 0 0
Thirteenth 2 2
Fourteenth 1 1 Bay 1 1
Fifteenth 3 3 Palm Beach 2 2
Sixteenth 0 0
Seventeenth 5 5 Broward 3 3
Eighteenth 2 1 Seminole 2 2
Nineteenth 0 0
Twentieth 3 3 Collier 1 1
Totals 35 34 Totals 16 13

The existing mix of supplemental resources in the trial courts, which includes senior judges, general masters, and hearing officers, trial court staff attorneys, alternative dispute resolution mediators, and *451 case management support, are reflected in the calculation of the Delphi case weights. These resources are necessary for the effective and efficient operation of Florida's trial courts. Any diminution in supplemental resources from existing levels as a result of budget reductions or the implementation of the 1998 revision to article V, section 14 of the Florida Constitution will increase the need for additional judges.
Mediators, hearing officers, and masters have both a qualitative and quantitative impact on the judicial processing of cases. These alternative resources have been put in place to lessen the need for more costly judgeships. An analytical process similar to the Delphi process used to develop the case-weighting system in 1998-99 should be developed to assess and measure the impact of these resources on judicial workload. Such analysis, however, is dependent on additional funding for staff or consultants. In the interim, this Court, through the Trial Court Performance and Accountability Committee, will continue its effort to define the role of supplemental hearing officers and resources. Workgroups have been established to study the use of hearing officers, senior judges, case management, mediators, and court reporters, and to identify the appropriate functions of these resources in the judicial system.
We remain cognizant of the factors and trends impacting the work of the trial courts and exacerbating the need for additional judges. Existing judicial resources are strained by the creation of highly effective but labor intensive "problem solving courts" (e.g., juvenile and adult drug courts, mental health courts, elder courts, and domestic violence courts); by the nature, complexity, and volume of certain criminal and civil cases (e.g., asbestos and tobacco cases); by the significant growth in the number of family law cases; and by the disproportionate levels of certain types of criminal cases (e.g., capital murder cases). At the same time, the courts' ability to address workload pressures using supplemental resources is impeded by a combination of factors, such as lack of state-funded general masters and the limited availability of senior judges. Moreover, judicial workload can be substantially impacted by the local legal culture, as reflected in state attorney filing practices, defendant-to-count ratios, the number of termination of parental rights cases, the litigiousness of the local legal culture, jury trial rates, pretrial motion practices, and post-judgment matters. Demographic issues, such as the presence of multiple correctional and juvenile facilities, population growth, and geographic considerations in multi-county circuits also place additional workload demands on the circuits.
County court caseloads continue to increase. The largest increases in county courts were found in civil case filings for those counties forecasted. Other factors impacting the workload of county courts include large increases in population and the number of cases filed, unmet judicial needs, caseload backlog, and the unavailability of traffic infraction hearing officers.
After reviewing the requests of the trial courts for thirty-five additional circuit judges and sixteen additional county judges in light of the foregoing considerations, we certify the need for thirty-four new circuit judges for the 2002-03 fiscal year as follows: five additional circuit judges each for the Eleventh and Seventeenth Circuits; four additional circuit judges for the Fifth Circuit; three additional circuit judges each for the Ninth, Fifteenth, and Twentieth Circuits; two additional circuit judges each for the Sixth, Seventh, Tenth, and Thirteenth Circuits; and one additional circuit judge each for the Eighth, Fourteenth, and Eighteenth Circuits. We certify the need for thirteen *452 new county court judges for fiscal year 2002-03 as follows: three additional county judges for Broward County; two additional county judges each for Orange, Palm Beach, and Seminole Counties; and one additional county judge each for Duval, Lake, Bay, and Collier Counties.
We appreciate the Legislature's sensitivity to the funding needs of the courts, especially during such austere economic times. Legislative support for essential services and resources directly impacts the efficient and effective use of judge time. Specifically, we emphasize the value of court personnel, such as trial court staff attorneys and case managers, who provide direct support to trial judges, because they significantly increase the productivity of our trial courts.
The Court therefore certifies the need for the additional judgeships which our study indicates are necessary for Florida's courts.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
NOTES
[1] Article V, section 9, Florida Constitution, provides:

Determination of number of judges. The supreme court shall establish by rule uniform criteria for the determination of the need for additional judges except supreme court justices, the necessity for decreasing the number of judges and for increasing, decreasing or redefining appellate districts and judicial circuits. If the supreme court finds that a need exists for increasing or decreasing the number of judges or increasing, decreasing or redefining appellate districts and judicial circuits, it shall, prior to the next regular session of the legislature, certify to the legislature its findings and recommendations concerning such need. Upon receipt of such certificate, the legislature, at the next regular session, shall consider the findings and recommendations and may reject the recommendations or by law implement the recommendations in whole or in part; provided the legislature may create more judicial offices than are recommended by the supreme court or may decrease the number of judicial offices by a greater number than recommended by the court only upon a finding of two-thirds of the membership of both houses of the legislature that such a need exists. A decrease in the number of judges shall be effective only after the expiration of a term. If the supreme court fails to make findings as provided above when need exists, the legislature may by concurrent resolution request the court to certify its findings and recommendations and upon the failure of the court to certify its findings for nine consecutive months, the legislature may, upon a finding of two-thirds of the membership of both houses of the legislature that a need exists, increase or decrease the number of judges or increase, decrease or redefine appellate districts and judicial circuits.
[2] Fla. R. Jud. Admin. 2.035.
[3] In 1997 this Court directed the Judicial Management Council to conduct an in-depth study of workload, jurisdiction, and related policy issues for the district courts of appeal. The Council's Committee on Appellate Court Workload and Jurisdiction proposed the adoption of a new appellate court workload standard of 225 dispositions per judge after submission on the merits and an additional appellate court workload standard of 385 case filings per judge. These two standards, whether considered separately or together, represent the levels at which a district court, presumptively, is in need of additional judicial resources. These standards are significantly higher than the current standard of 250 case filings per judge and reflect the infusion of support staff and other resources over the last decade which have enabled the district courts to keep pace with workload increases.
[4] The Legislature actually funded twenty-seven judgeships. One circuit judgeship in the Second Circuit was funded in addition to those certified.
[5] Historically, the caseload-based system used prior to 1999 did not address these factors; however, the case-weighting system that is the basis of our 2002-03 certification opinion does. The forty-seven judgeships certified in this opinion reflect last year's certification of forty-four judgeships. If the full complement of judges requested in the 2000-01 certification had been funded, it is certain that the need for additional trial judges would have been significantly less. The Delphi data for this year's request indicates that at the circuit level there will be an overall increase in filings of three and two-tenths percent from 1999 to 2002. Once the "gap" created by the transition to a case-weighted system is addressed, the numbers certified should reflect a more moderate increase in judicial need over time.
[6] We remain concerned that the reasonable workload standard for delinquency cases, which was recommended by the Delphi Policy Committee, does not allow for sufficient judicial time to adequately address delinquency matters. We hereby request the Delphi Policy Committee to thoroughly reexamine the reasonable workload standard for delinquency cases when the committee is reappointed to conduct a review of the Delphi-based case weighting analysis.
[7] The Supreme Court's Court Statistics and Workload Committee has advised us that a separate Summary Reporting System (SRS) category should be established for post-judgment matters in dissolution cases. This separate category was also recommended by the Delphi Policy Committee. This process will be lengthy and complicated and will take approximately two to three years to develop and implement. At present, the current weight (sixty minutes) assigned to dissolution cases is inclusive of post-judgment matters. If a separate post-judgment category is created, it is likely that the current weight for dissolution cases will decrease to some degree. In the interim, we will continue to use the lower case weight of sixty minutes for dissolution cases.
[8] We have maintained the thirty-eight minute case weight for drug cases at this time. However, we are aware that cases administered through the drug court programs require additional judicial workload through ongoing status review hearings which monitor offenders' compliance with court requirements. The number of operational criminal drug courts in Florida has drastically increased since 1996from ten to thirty-tworepresenting over a 200 percent growth in these problem-solving courts. Drug courts are an effective strategy to address substance abuse, one of the main causes of many offenders' criminality and interaction with the justice system. Therefore, we have directed the Drug Court Steering Committee and the Court Statistics and Workload Committee to further study the ever-increasing use of drug court programs in Florida and advise us as to the overall impact of these labor intensive courts on the weights for drug cases. It is also likely that the demand on drug court judges may increase if proposed legislation is adopted that expands the offense eligibility criteria to include nonviolent third-degree felonies.
[9] The Court Statistics and Workload Committee along with staff of the Office of the State Courts Administrator have reviewed the case weights for county evictions and civil traffic infractions. The Delphi Policy Committee also requested further study on this issue at the conclusion of the Delphi process in 1998. Further analysis concludes that the higher weights are reasonable and appropriate measures of judicial involvement. Thus, the committee recommends that the higher weight for both categories, eight minutes for county evictions and .34 minutes for civil traffic infraction filings, be adopted. We concur with this recommendation.