DISCIPLINARY COUNSEL *v.* SQUIRE.

[Cite as *Disciplinary Counsel v. Squire,*
116 Ohio St.3d 110, 2007-Ohio-5588.]

(No. 2007–0492—Submitted July 10, 2007—Decided October 25, 2007.)

LUNDBERG STRATTON, J.

{¶ 1} This court admitted respondent, Carole H. Squire of Columbus, Ohio, Attorney Registration No. 0031715, to the practice of law in Ohio in 1977. In November 2000, respondent was elected to the Franklin County Court of Common Pleas, Division of Domestic Relations and Juvenile Branch, her term commencing January 2001. In a complaint filed on October 10, 2005, and amended on March 2, 2006, relator, Disciplinary Counsel, charged respondent with four counts of misconduct involving 40 violations of the Code of Judicial Conduct and 12 violations of the Code of Professional Responsibility.

{¶ 2} Relator's allegations implicated incidents from 2003 through 2006. A three-member panel of the Board of Commissioners on Grievances and Discipline heard the cause, conducting eight days of proceedings during August, September, and October 2006. From the testimony of 28 witnesses, the parties' factual stipulations, 125 stipulated exhibits, and numerous other exhibits, a unanimous panel made findings of misconduct with respect to all counts of the complaint and recommended that respondent be suspended from the practice of law for 12 months, with six months stayed on condition of no further disciplinary violations within the one year period of suspension. The board accepted the panel's findings of misconduct as to all counts, but recommended that respondent be suspended from the practice of law for a period of two years with one year of the suspension stayed.

## Count One

{¶ 3} Count One involves proceedings before respondent regarding the cases of *Allison v. Patterson* and *Patterson v. Allison.* Respondent granted Teresa

Allison's petition for an ex parte civil protection order ("CPO") against Brent Patterson, the father of the couple's child. When Allison later filed an amended petition requesting that the couple's minor child be included as a protected party under the CPO, respondent was required by R.C. 3113.31(D)(1) to hold an ex parte hearing on a CPO the same day the petition was filed. Respondent told the parties that she was going to conduct an "investigation" and that she was going to consult with Franklin County Children Services ("FCCS").

{¶ 4} Respondent repeatedly refused to make a decision and refused repeated requests for a hearing, telling Allison's counsel, attorney Lorie McCaughan, "I'm not going to do that, and if you don't like it, you can appeal me. You're not going to run my courtroom." When McCaughan and co-counsel Jenifer Thompson reiterated their position that the statute required a hearing within 24 hours, respondent stated that "every law was made to be moved around." Respondent required McCaughan to check back repeatedly during the following three days to learn whether respondent had talked to FCCS and was ready to hear the cases.

{¶ 5} Due to a guardianship, Patterson had custody of the minor child at that time. Concerned about the welfare of the child because respondent would not rule on the CPO, McCaughan and Thompson filed for an emergency custody order ("ECO"). The ECO was assigned to Judge Preisse, who was duty judge that week in juvenile court. Judge Preisse granted the ECO, giving emergency temporary custody of the child to the mother, Allison.

{¶ 6} That same day, November 7, 2003, McCaughan and Thompson filed a complaint for writs of prohibition and mandamus in the Tenth District Court of Appeals to attempt to force respondent to make a decision on Teresa Allison's amended ex parte CPO. The court of appeals and the parties, including respondent, agreed that the court would not issue the writs *if* respondent would hold the hearing immediately on the record.

{¶ 7} Later that day, the ECO was served on Patterson, who was sitting with the paternal grandmother and the child in respondent's private conference room. The attorney who served Patterson escorted the child to another floor to await the mother's arrival, but was soon advised to return to the courtroom. As soon as respondent saw the child, she snatched her by the arm abruptly, screamed, "No, no, no" at McCaughan, and said that the ECO was invalid and that she was going to bring kidnapping charges.

{¶ 8} After escorting the child into her chambers, respondent returned to the courtroom, where she stated that she did not care what anybody said, the child was only going home with her father. Respondent then proceeded to hold a hearing, the nature of which was not clear and which respondent refused to clarify. Respondent announced that she had spoken with a representative of FCCS "on at least three or four occasions." Later in the hearing, she stated that

she had talked to FCCS "on at least seven or eight occasions" in the previous two days and had concluded that because FCCS was not treating the *Allison* and *Patterson* cases like emergencies, neither would she. Respondent also stated that she had heard information about the case from the child's grandmother outside the presence of Allison's attorneys.

{¶ 9} At various times during the proceeding, respondent stated that she had granted Patterson's cross-filing and then stated that she had not yet done so, but that she intended to. When McCaughan attempted to cross-examine Patterson, respondent acted as Patterson's advocate, answering questions that were directed to him, then questioning Patterson herself and instructing him whether to answer.

{¶ 10} At the end of the proceedings, no decisions were rendered in either case, but three days later, respondent awarded temporary custody to the paternal grandmother, who was not a party to either the CPO or the ECO, until November 12, 2003. This entry was in direct contravention of Judge Preisse's ECO granting custody of the child to the mother, Allison, and contravened R.C. 3113.31(E)(1)(d) by allocating parenting rights that had already been established.

{¶ 11} Despite respondent's pronouncement at the November 7 hearing that the matter would not be reconvened until November 12, she summoned counsel and the parties to appear before her on November 10. McCaughan explained that Allison could not be present and stated that they could not go forward with Allison's amended ex parte petition. McCaughan asked to be excused from the courtroom, but respondent ordered her to stay. Respondent then went off the record and berated McCaughan, made rude and contradictory statements, and eventually stood in front of McCaughan, shaking her finger at her, screaming, "You're nothing but a liar."

{¶ 12} McCaughan filed an affidavit of disqualification under R.C. 2701.03 on November 12, 2003, with the Supreme Court of Ohio seeking respondent's disqualification from *Allison v. Patterson,* case No. 03 DV–10–786, and *Patterson v. Allison,* case No. 03 DV–11–806. Filing an affidavit of disqualification operates to stay all proceedings pending before a judge. R.C. 2701.03(D)(1). However, respondent refused to be served with the affidavit, even though McCaughan and Thompson later learned that the Supreme Court of Ohio had faxed the affidavit to respondent prior to the hearing scheduled for that day.

{¶ 13} Later, without explanation, respondent indicated that she would hear *Patterson v. Allison.* In spite of repeated attempts by Allison's counsel to get respondent to terminate the proceedings due to the affidavit of disqualification, respondent refused to recuse herself. Respondent repeatedly detailed her ex parte efforts to "investigate" the case, stating that she was "calling [FCCS] day to day. We have records of multiple calls." Throughout these proceedings, the

attorneys repeatedly asked respondent to clarify what motion was before the court. Allison was present in court, but was not prepared to proceed, as she had not received notice that respondent intended to conduct on that day the full hearing that had been scheduled for nearly two weeks later, on November 24, 2003.

{¶ 14} Respondent permitted Patterson to present testimony in support of his own petition for a CPO. At various times, respondent interrupted Patterson's testimony and interjected her own version of the case. When asked whether they wished to question Patterson, McCaughan repeated that she and Thompson could not participate in the proceedings and attempted to restate her previously stated objections. Respondent would not permit counsel to object or be excused.

{¶ 15} Respondent then stated she would hear Allison's *amended* petition. Respondent refused to allow Allison's counsel to speak with Allison and refused to allow Allison to check the hallway for her witnesses. Allison stated that she did not wish to proceed without counsel and that she was confused about what was happening. Respondent told Allison she could proceed or her case could be dismissed.

{¶ 16} Ultimately, Allison acted pro se although respondent required her counsel to remain in the courtroom. Respondent continually interrupted Allison, badgered her as she tried to present her case, and refused to allow her to leave the stand to retrieve documents or to have her attorneys bring them to her. Allison repeatedly stated that she was confused and did not understand what respondent wanted from her. At one point when Allison again tried to ask respondent what she wanted, respondent answered, "I don't care. Whatever. I don't care."

{¶ 17} Ultimately, respondent filed a judgment entry continuing Patterson's CPO. Respondent added the following language to the order: "[Minor child] is to remain in the care of Claudine Shelfo [the paternal grandmother] and is not to have unsupervised visits with either Petitioner father or Respondent mother. Said visits shall only occur by agreement of petitioner and respondent and approved by the court."

{¶ 18} Allison's counsel, Thompson, testified that in January 2004, respondent contacted her and told her that she "had caused [respondent] to send a child to the wrong home, that she sent a child home with a mentally-ill mother, and that [respondent] had made the wrong decision based on the fact that she had to deal with [Thompson's] case and spend so much time with [Thompson], and that [Thompson] would have to answer to God for [her] actions in this case, and that she had made her peace with God, and that God would deal with [Thompson] in the end." She also stated that if Thompson "continue[d] down this road that

[she] would have to pay for [her] actions, and that [Thompson] needed to learn to be courteous in the courtroom."

*Analysis*

{¶ 19} The board concluded that respondent had engaged in a series of transgressions that violated the Code of Judicial Conduct and the Code of Professional Responsibility. By failing to follow Ohio law with regard to the ex parte CPO petitions, respondent violated the following Canons of the Code of Judicial Conduct: Canon 1 (a judge shall uphold the integrity and independence of the judiciary); Canon 3(B)(1) (a judge shall hear and decide matters assigned to the judge except those in which disqualification is required); and Canon 3(B)(2) (a judge shall be faithful to the law and maintain professional competence in it). Further, the respondent violated DR 1–102(A)(5) (a lawyer shall not engage in conduct that is prejudicial to the administration of justice).

{¶ 20} By contacting FCCS repeatedly and engaging in ex parte communications with Patterson, his mother, the child, and Jenifer Thompson, respondent violated Canon 3(B)(7) (a judge shall not initiate, receive, permit, or consider communications made to the judge outside the presence of the parties or their representatives concerning a pending proceeding) and Canon 4 (a judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities).

{¶ 21} In her interactions with Allison and her attorneys, respondent repeatedly violated Canon 3 (a judge shall perform the duties of judicial office impartially and diligently); Canon 3(B)(4) (a judge shall be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity and shall require similar conduct of lawyers, and of staff, court officials, and others subject to the court's direction and control); and Canon 3(B)(5) (a judge shall perform judicial duties without bias or prejudice); and Canon 4.

{¶ 22} By refusing to consider the matters brought before her in the matters of *Allison v. Patterson* and *Patterson v. Allison,* respondent violated Canon 3(B)(8) (a judge shall dispose of all judicial matters promptly, efficiently, and fairly) and Canon 4, and DR 1–102(A)(5).

{¶ 23} By refusing to timely disqualify herself and in insisting upon conducting the November 12, 2003 hearing knowing that an affidavit of disqualification had been filed, respondent violated Canon 3(E)(1) (a judge shall disqualify herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which the judge has a personal bias or prejudice concerning a party or a party's lawyer or personal knowledge of

disputed evidentiary facts concerning the proceeding) and Canon 4, and DR 1–102(A)(5).

{¶ 24} Respondent argues that R.C. 3113.31 does not require a ruling on the day that the petition for a civil protection order is filed, but merely a hearing. The reason for the hearing is to expedite a decision on the ex parte petition, given the emergency nature of the proceedings. While it is true that the decision whether to grant a CPO is within the discretion of the trial court, as concluded by the board, respondent simply refused to make a decision at all. Respondent's failure to make a decision to grant or deny the amended petition for an ex parte CPO denied the parties their rights to the protections of R.C. 3113.31.

{¶ 25} Respondent challenges the board's conclusion that she acted improperly when she conducted a hearing and issued an order changing the custody provisions previously ordered by Judge Preisse in granting an ECO. Respondent questions how the board can find fault with her holding a hearing and making a decision after she was ordered to do so by the Tenth District Court of Appeals. Judge Preisse's involvement in respondent's case would not have been necessary but for respondent's failure to make a ruling on the case. Further, respondent was aware of Judge Preisse's order and even stated that she had retrieved Judge Preisse's order from the clerk's office and that she "deliberately didn't give it to [Patterson], deliberately didn't allow him to have a copy, and I didn't feel it was appropriate." The court of appeals mandated that respondent hold a hearing, not that she make improper rulings.

{¶ 26} Moreover, respondent contends that she could not make various decisions she was being asked to make due to the need for investigation. However, respondent's so-called attempts at "investigations" resulted in ex parte communications with FCCS and Claudine Shelfo, the child's grandmother.

{¶ 27} As for respondent's contention that multiple filings within a short period of time made managing the case difficult, many of the filings made during this time were due, in part, to respondent's failure to rule on the petition before her. Finally, with regard to respondent's failure to terminate the proceedings after McCaughan and Thompson filed an affidavit of disqualification, respondent argues that R.C. 2701.03(D)(2)(a) vests a judge with discretion to proceed if the affidavit was filed less than seven days prior to a scheduled hearing. Respondent ignores well-established precedent holding that the requirement can be set aside when it is demonstrated that compliance with the seven-day requirement is impossible. See, e.g., *In re Disqualification of Leskovyansky* (1999), 88 Ohio St.3d 1210, 723 N.E.2d 1099. Clearly, in this case, compliance with the seven-day requirement was impossible because instances of respondent's bias occurred less than seven days before the scheduled hearing.

{¶ 28} Consequently, we adopt the board's findings of fact and conclusions of law with respect to Count One.

## Count Two

{¶ 29} In Count Two, the complaint alleges that Susan Lantz represented Gregory Camburn in divorce proceedings in respondent's court. Camburn filed a petition for an ex parte CPO, case No. 01 DV–01–051, asking that Camburn and his two small children be protected from Camburn's wife, Maria. On the day the petition was filed, Lantz and her client were called into respondent's courtroom. After briefly speaking to Camburn, respondent stated that she needed to conduct an "investigation." Respondent then called the maternal grandparents from her telephone on the bench, engaging in an ex parte communication with the maternal grandmother about the children and the need for protection. Following the call, respondent telephoned Maria Camburn's attorney and informed his office that Maria's husband was seeking an ex parte CPO. Respondent then granted a CPO protecting Camburn, but not the children.

{¶ 30} Ten days later, Lantz filed a petition for an emergency custody order for the two children. When Lantz attempted to enter respondent's courtroom, respondent's bailiff stopped her and said, "We're really not open for business. You'll have to come back." Lantz attempted to give the motion to the bailiff to give to respondent, but the bailiff went back inside the courtroom and locked the door.

{¶ 31} Later, when Lantz was able to speak with respondent about the ECO, respondent flipped through the petition and told Lantz that she needed additional evidence. Lantz left the courthouse, gathered additional evidence, and returned about an hour later, whereupon she learned that respondent had left for the day. In respondent's absence, Lantz presented the petition for the ECO to Judge Lias, the duty judge for that week, who signed the order granting custody to Greg Camburn.

{¶ 32} At the full hearing on the ex parte CPO and at the review hearing on the ECO, respondent refused to allow Lantz to speak and refused to allow a record to be made of the proceeding. Before a scheduled hearing later that day, Lantz filed motions for recusal in both the divorce and CPO cases. Respondent refused to recuse herself, repeatedly denied Lantz a record of the proceedings, and refused to allow her to make a proffer.

{¶ 33} After respondent left the courtroom, Lantz attempted to call a colleague for guidance. When respondent returned minutes later, Lantz hung up. Respondent immediately found Lantz in contempt. Respondent continued to refuse to allow a record of the proceedings, refused to allow Lantz to represent Camburn, and gave Camburn 30 minutes to secure new counsel. Respondent did

allow the court reporter to transcribe a partial record of the events, including her finding Lantz in contempt. The transcript contains portions of Lantz's attempted proffer, but it is clear from the transcript that portions of the proceedings were conducted off the record because of respondent's refusal to go on the record. Ultimately, Lantz made her proffer and secured new counsel for Camburn.

{¶ 34} Respondent falsely stated on the record, in the presence of Camburn's new attorney, that respondent had ordered the children to be present on several occasions. Further, respondent terminated the ECO, stating that she had heard extensively from Mr. Camburn, when in fact, Camburn had not been allowed to provide testimony. Moreover, respondent stated that she had also heard from Lantz on multiple occasions on behalf of Camburn, but Lantz had never been permitted to address the court on behalf of her client. And respondent falsely stated that the call respondent had made to the maternal grandparents was "by agreement of Ms. Lantz and her client at the time."

{¶ 35} Respondent subsequently set aside the ex parte CPO, granted sole temporary custody of the Camburn children to Maria, and scheduled a review hearing for February 10. A second purpose of this hearing was to address the Lantz contempt matter. When Lantz's attorney, Thomas Tyack, arrived at the hearing with his client, respondent's bailiff read him a statement from respondent informing him that based on Lantz's "inappropriate" behavior, Lantz would not be permitted to be present in the courtroom for the custody matter unless she apologized to respondent. Lantz could, however, be present for the contempt part of the hearing.

{¶ 36} When the hearing commenced and it became apparent that respondent was proceeding on the custody issue, Tyack became concerned, as Lantz was present with him. He rose and addressed respondent, asking that the message that the bailiff had given him be read into the record. Respondent declined. When Tyack tried to insist, respondent accused him of a lack of respect. When Tyack asked whether respondent wanted Lantz to leave the courtroom, respondent denied ever having said that Lantz could not be present for both the custody and contempt matters. She then contradicted herself by stating that Lantz could not stay for the custody part of the hearing unless she apologized, but would not permit her to leave when she proceeded on to the custody matter.

{¶ 37} Shortly after the hearing, Lantz appealed the contempt order. Despite the fact that respondent was still the judge of record in the Camburn custody matter, respondent contacted Maria Camburn's parents and her daughter ex parte to obtain affidavits from them in support of her version of the events surrounding the contempt citation.

{¶ 38} Two months later, this court disqualified respondent from all of the Camburn matters. *In re Disqualification of Squire*, 110 Ohio St.3d 1202, 2005-

Ohio-7157, 850 N.E.2d 709. Eight months later, the Tenth District Court of Appeals reversed respondent's order of contempt and held that respondent had abused her discretion by holding Lantz in contempt. *Camburn v. Camburn,* Franklin App. No. 05AP–152, 2005-Ohio-6502, 2005 WL 3317349.

*Analysis*

{¶ 39} By failing to follow Ohio law with regard to the ex parte CPO petitions, respondent violated DR 1–102(A)(5), the board found. By contacting the parent of a party via telephone and gathering evidence without the participation of opposing counsel during what should have been an ex parte proceeding, by contacting that party's attorney via telephone and informing him of what is legally intended to be an ex parte proceeding, and by contacting the parents of a party and the party's minor child in order to obtain affidavits to file in the court of appeals without the participation of attorney Susan Lantz and her client, respondent violated Canon 3(B)(7), Canon 4, and DR 1–102(A)(5), according to the board.

{¶ 40} The board concluded that in her interactions with Gregory Camburn, Susan Lantz, and Thomas Tyack, respondent had repeatedly violated Canon 3, Canon 3(B)(4), and Canon 3(B)(5).

{¶ 41} The board concluded that by refusing to consider the matters presented to her regarding the petition for an ex parte CPO filed by Greg Camburn and his original motion for an ECO, respondent had violated Canon 3(B)(8) and DR 1–102(A)(5).

{¶ 42} By refusing to timely disqualify herself and in insisting upon conducting the February 10, 2005 hearing after the affidavit of disqualification had been filed, respondent violated Canon 3(E)(1), Canon 4, and DR 1–102(A)(5), according to the board.

{¶ 43} Respondent contends that it was proper for her to investigate the allegations in the *Camburn* case. Again, Ohio law does not require or permit respondent to conduct her own investigation of circumstances underlying the petition for a CPO or permit respondent to delay her decision in order to conduct or require such an investigation.

{¶ 44} As for respondent's ex parte communications with the maternal grandmother of the child in this case, respondent argues that nothing in the law prevented a reasonable inquiry. However, as with Count One, there is nothing in R.C. 3113.31 that permits respondent to make such improper ex parte communications.

{¶ 45} With regard to respondent's false statement on the record that she had already heard from Mr. Camburn, respondent contends that often the lawyers and clients come to the bench and speak freely in front of the court and that she

had in fact heard from Mr. Camburn in that way. The evidence indicates that respondent actually heard from Mr. Camburn on only one occasion, the day he filed his petition for an ex parte CPO. There was no evidence supporting respondent's assertion that she had heard from Mr. Camburn "extensively" or that she had asked him a "series of questions."

{¶ 46} As for respondent's insistence that Lantz was overzealously representing her client by repeatedly presenting herself in respondent's courtroom and filing numerous motions, as with Count One, had respondent followed the law and made a ruling on the petition for an ex parte CPO the day that it was presented to her as required by law, it would not have been necessary for Lantz to return to respondent's courtroom and make various filings attempting to compel respondent to fulfill her judicial obligations. Finally, respondent argues again that she did not recuse herself after the affidavit of disqualification was filed in this case because it was filed too late, less than seven days prior to the scheduled hearing. For the reasons stated above, compliance with the seven-day requirement was impossible because instances of respondent's bias occurred less than seven days prior to the date of the scheduled hearing.

{¶ 47} Accordingly, we adopt the findings of fact and conclusions of law of the board with respect to Count Two.

### Count Three

{¶ 48} Count Three involves proceedings before respondent regarding the divorce case of Audra Fleming and Dr. Ronald Fleming. Dr. Fleming was represented by attorney Michael Winston, but attorney Kim M. Halliburton–Cohen was retained to serve as co-counsel. On June 14, 2004, Halliburton–Cohen filed a motion to continue the hearings scheduled for June 15 and 16, attaching a letter from Dr. Fleming's employer stating that Dr. Fleming would be unable to attend those hearings.

{¶ 49} On June 15, 2004, Halliburton–Cohen spoke to Ms. Fleming's counsel, attorney Peggy Blackmore, and learned that respondent had held an ex parte conversation with Blackmore about the continuance. When Halliburton–Cohen and Blackmore appeared for the scheduled hearing that day, respondent was absent. Respondent telephoned the bailiff and indicated that she wished to speak on the telephone to Blackmore only. Halliburton–Cohen objected, insisting that a record be made of this ex parte conversation. Respondent's bailiff repeated this objection back to respondent via the phone and then told Halliburton–Cohen, "The Judge says she doesn't care." Blackmore held the phone out so that Halliburton–Cohen could hear the conversation between her and respondent.

{¶ 50} Respondent appeared in her courtroom about an hour later and made several misstatements regarding *Fleming v. Fleming*. For example, despite

Halliburton–Cohen's explanation that she was co-counsel with attorney Winston and that she was appearing on behalf of Dr. Fleming, respondent repeatedly insisted that she could not proceed without Winston because he had not requested leave to withdraw as counsel and because Halliburton–Cohen "doesn't know any of the history" of the case.

{¶ 51} Respondent would not permit Halliburton–Cohen to address the motion for a continuance. Respondent falsely claimed that her bailiff had left telephone messages for each counsel on the date of the scheduled hearing stating that the hearing would go forward despite the motion for continuance. Respondent told Halliburton–Cohen that if she spoke, respondent would eject her from the courtroom.

{¶ 52} When Halliburton–Cohen and Blackmore attempted to direct the court's attention to substantive pending matters, respondent repeatedly returned to the issue of Winston's allegedly unexcused absence from her courtroom. After several more inquiries concerning Winston's absence, respondent then continued the case to the next day, believing that she could not go forward without Winston.

{¶ 53} Winston appeared at the courthouse the next morning and told Halliburton–Cohen that he had spoken to respondent, who had demanded his presence and called Halliburton–Cohen a "pit bull."

{¶ 54} Halliburton–Cohen described respondent's demeanor during the proceedings that occurred off the record that day as "bizarre," "angry," and "[c]hildish." Respondent berated Winston for saying he could not be there that afternoon and threatened to find him in contempt if he did not show up. Halliburton–Cohen was present and repeatedly requested that a record be made of the proceedings, but respondent either denied her requests or ignored them. Ultimately, respondent told Winston, "You will be here. You will be here. You will be here." She then left the bench, came over to counsel's table, and took Winston by the arm, saying, "I'm trying to tell you something."

{¶ 55} Respondent then faxed a letter to Dr. Fleming at his place of employment before the afternoon session on June 16, 2004, and did not provide a copy of this letter to the attorneys beforehand. Respondent also called Dr. Fleming's place of employment and spoke with his office manager, informing her that if Dr. Fleming was not at court that afternoon, she would send a police escort for him.

{¶ 56} In the afternoon session on June 16, 2004, Winston appeared with his attorney and informed the court that he was no longer counsel for any party in the case. Winston stated that he was not aware of an order requiring his attendance on June 15 or June 16. After making a lengthy statement concerning Winston's absence from the prior hearing, Dr. Fleming's absence, and her ex parte communications with Dr. Fleming, respondent admitted that she had threatened Winston with contempt if he did not appear.

{¶ 57} At various points in the hearing, respondent indicated that she had "released" Winston from the case and then contradicted herself. When Halliburton–Cohen tried to clarify an objection for the record, respondent threatened her with a $100 fine if she spoke again. Ultimately, respondent held Halliburton–Cohen in contempt, but never journalized the contempt finding.

{¶ 58} Respondent repeated her frustration with Winston for being absent from the hearing the day before and refused to accept Winston's explanation that his co-counsel, Halliburton–Cohen, was properly present in his stead. Respondent refused to allow Winston to consult with his attorney, and she denied Halliburton–Cohen's motion for recusal and request for a hearing.

{¶ 59} Shortly after Halliburton–Cohen filed an affidavit of disqualification against respondent in this court, respondent filed an entry disqualifying herself from the Fleming case and all other cases in which Halliburton–Cohen was or would become counsel of record. However, the board found that respondent's entry of disqualification contained false and inflammatory statements. For example, although the entry accurately states that attorney Winston filed a motion to withdraw from the Fleming case, the entry falsely states, "In consideration of the exhorbitant [sic] amount of time and grace extended to the Defendant throughout the pendency of the case, the undersigned declined Attorney Winston's motion to withdraw." In reality, respondent had granted Winston's motion to withdraw nearly a year and a half earlier.

*Analysis*

{¶ 60} The board concluded that during respondent's interactions with Halliburton–Cohen and Winston during the hearings held on June 15 and 16, 2004, in *Fleming v. Fleming*, respondent had repeatedly violated Canon 3, Canon 3(B)(4), Canon 3(B)(5), and Canon 4.

{¶ 61} The board further concluded that by engaging Ms. Fleming's attorney in a conversation regarding the disposition of the motion to continue without the participation of Dr. Fleming's attorney, respondent had violated Canon 3(B)(7) and Canon 4.

{¶ 62} The board found that by refusing to appropriately consider all matters before her with regard to the motion for continuance filed by Dr. Fleming and presented to the court by his attorney, respondent had violated Canon 3(B)(8) and Canon 4, as well as DR 1–102(A)(5).

{¶ 63} The board concluded that by personally contacting Dr. Fleming's place of employment regarding a matter pending before her, respondent had violated Canon 2 (a judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of

the judiciary), Canon 3(B)(4), Canon 3(B)(7), and Canon 4, as well as DR 1–102(A)(5).

{¶ 64} The board concluded that in her entry disqualifying herself from the Fleming case and all other cases in which Halliburton–Cohen was or became counsel of record, respondent had violated DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), Canon 2, Canon 3(B)(4), and Canon 4.

{¶ 65} Regarding the panel's finding that respondent had spent two days insisting that Dr. Fleming and Winston be present in court, respondent asserts that Halliburton–Cohen conceded that a local rule required parties to be present but felt that she had the right to ignore the rule. But Loc.R. 3(D) requires attendance of parties only at status conferences and pretrial hearings. Moreover, respondent never cited the local rule during her two days of insistence, but rather, waited until her disciplinary proceedings.

{¶ 66} Respondent also contends there was no evidence that she did anything inappropriate toward the parties or their attorneys in the Fleming case. The panel noted that respondent (1) stated that she "didn't care" when Halliburton–Cohen asked to hear a telephone call between respondent and opposing counsel, (2) repeatedly refused to permit Winston and Halliburton–Cohen to address the court, (3) threatened to hold Winston in contempt if he did not appear in her courtroom despite the fact that he was not legally required to be there, (4) called Haliburton–Cohen a "pit bull" to Winston, and (5) called Dr. Fleming's place of employment and threatened that she would send a police escort for him if he was not at court that afternoon.

{¶ 67} Respondent contends that Winston's attorney, Christopher Cooper, testified that he never saw respondent do anything inappropriate in the Fleming case, and in fact, believed that Winston was inappropriate in his behavior to the court. However, as relator points out, Cooper saw less than 20 to 30 minutes of *one* of the hearings on *one* of the days in question. The events that constitute the majority of the misconduct in Count Three took place over two days and approximately ten to 14 hours. Moreover, even if the attorneys in respondent's courtroom were being disrespectful toward her, respondent still had an obligation to conduct herself in a courteous and dignified manner.

{¶ 68} Respondent's characterization of her ex parte communication with opposing counsel as procedural is misplaced. Further, her ex parte communication with Dr. Fleming's employer and threatening of Dr. Fleming were clearly inappropriate. Finally, as for her disqualification in the Fleming case, respondent argues that the board penalized her for disqualifying herself when, in fact, the violations arose from her false statements in the disqualification entry.

{¶ 69} Therefore, we adopt the board's findings of fact and conclusions of law with respect to Count Three.

## Count Four

{¶ 70} Count Four involves proceedings before respondent in the cases of Tylee Delibro and Carol Barbee, which are separate and unrelated.

### *Delibro*

{¶ 71} FCCS filed a complaint in September 2004 alleging that four-year-old Tylee Delibro was an abused, neglected, and dependent child. Attorney Richard Innis, on behalf of the Ponca Nation of Oklahoma, filed a motion to transfer the case to the Ponca Tribe's juvenile court in Ponca City, Oklahoma, on the basis that the child was of Native American heritage. All parties agreed that the matter should be transferred, and prior to the hearing on the motion, FCCS arranged to have a social worker fly to Columbus to pick up the child.

{¶ 72} On the date that the social worker from Oklahoma was to arrive, Magistrate Goodrich approved the motion to transfer, and Innis immediately took the order up to respondent's courtroom for her signature. Innis explained the urgency of the matter to respondent, informing her that a social worker from Oklahoma was arriving at the airport momentarily to pick up the child, to which respondent replied, "That's his emergency, not mine."

{¶ 73} Innis explained that this was an administrative decision, that all of the parties were in agreement that the child could not leave the county without the signed order, and that time was of the essence. Respondent informed Innis that she had to make "an independent investigation." Innis stated that he could get all parties up to her courtroom immediately, to which respondent replied, "I'm going to lunch." When Innis informed respondent that he would have everyone involved back in her courtroom at 1:30, respondent replied, "Fine," and left.

{¶ 74} Innis, the Oklahoma social worker, the guardian ad litem, the mother's attorney, and the FCCS caseworker were present at 1:30, but respondent did not return. Given that time was of the essence and that respondent was nowhere to be found, the parties located Judge Preisse, who reviewed the paperwork and signed the entry.

{¶ 75} After Judge Preisse signed the entry, she asked Innis to write a letter stating what occurred that day, and Innis did. Judge Preisse forwarded the letter to the Office of Disciplinary Counsel, with Innis's permission. After filing an entry of recusal from all of Innis's cases and then an entry revoking that recusal, respondent filed a second entry of recusal, falsely stating that Innis had told respondent that he was directed by Judge Preisse to write a letter in

exchange for Judge Preisse's signature on the entry. Further, respondent indicated falsely that Innis had lied to her about Judge Preisse's instructions.

### Barbee

{¶ 76} Attorney Innis also represented Carol Barbee in an uncontested divorce proceeding before respondent. The final hearing was scheduled before respondent a few months after the Delibro matter. Respondent took the bench 40 minutes late, called Innis to the bench and accused him of misrepresenting the facts to the court in the Delibro case, and stated that Innis had no integrity and was not fit to practice law. Respondent then told Innis that she was going to recuse herself from any further cases involving Innis, and she refused to hear Barbee's scheduled final divorce hearing. After being made aware of the situation with respondent, Judge Lias promptly heard the case and signed the decree.

### Analysis

{¶ 77} The board concluded that in her interactions with attorney Innis on January 23, 2006, disparaging him in open court in the presence of his client, Carol Barbee, and in respondent's subsequent judgment entries of recusal, reinstatement, and second recusal, respondent violated DR 1–102(A)(4) and 1–102(A)(5), Canon 3(B)(4), Canon 3(B)(8), and Canon 4.

{¶ 78} Respondent's argument that the emergency in the Tylee Delibro case arose from the parties' lack of planning is both implausible and irrelevant. All parties in the matter agreed that the case would be transferred to the Ponca tribal court for further proceedings. Under federal law, unless there is an objection by specified parties, jurisdictional transfer is mandatory. Section 1911, Title 25, U.S.Code. The entry presented to respondent on September 30, 2005, for her signature by attorney Innis was an *agreed* entry.

{¶ 79} Respondent refused to sign the entry, stating that it was "not [her] emergency," left the bench for lunch, and then did not return to her courtroom when she said she would. Respondent argues that she was back in the courthouse less than 30 minutes after Judge Preisse was asked to intervene. But clearly the parties did not know when she would return, and the matter was urgent.

{¶ 80} Accordingly, we adopt the board's findings of fact and conclusions of law with respect to Count Four.

### Aggravating Circumstances

{¶ 81} The panel found that respondent had committed multiple offenses and engaged in a pattern of misconduct. "The testimony and exhibits before the panel establish Respondent's pattern of ignoring clear procedural and substantive

requirements of the law necessarily to be followed by a judge for prompt, fair, and impartial decision of issues presented for her judicial decision; a pattern of intemperate, unjudicial conduct in proceedings brought before her; a pattern of failure to follow the law and of blaming other judges, lawyers and litigants for the consequences of her failures and actions; a pattern of rationalizing and revising the facts of past events to excuse her own conduct or to blame others by making baseless allegations of wrongful or malicious actions and motives of others; a pattern of judicial over-reaction and abuse of judicial power to hold or threaten to hold lawyers in contempt of court; a pattern of ex parte communication with parties, counsel and witnesses and of improper judicial investigations; and a pattern of failure or refusal to recuse herself as judge in proceedings where her impartiality and bias was manifested."

{¶ 82} Moreover, the panel concluded that respondent had engaged in multiple offenses, submitted affidavits with self-serving statements and opinions contradicting both the record of proceedings and the otherwise unrebutted testimony of others, and has refused to acknowledge the wrongful nature of her conduct. In fact, respondent's testimony on cross-examination was rambling, confused, confusing, and unresponsive and revealed a respondent who not only believes that she did nothing wrong, but believes that she is to be admired.

{¶ 83} For example, when discussing her repeated attempts to call FCCS to conduct her "investigations," she stated, "I sat there in my office—I went Saturday and Sunday. I sat there and I called like every three minutes, just kept on." She spent seven pages of transcript in a rambling attempt to answer the question: "[D]id you raise your voice at any time to Lorie McCaughan or Jenifer Thompson?" She spent more than ten pages making evasive and confused statements in response to the question, "As you reviewed it today, Judge, is there anything in Exhibit 18 that is not correct?" Moreover, at one point in her testimony, respondent, citing the effects of hypoglycemia, admitted that during the November 7, 2003 hearing in the Allison/Patterson case, "[she] was in a fog." She testified, "I was so confused. I had no idea what to do. * * * I think the record pretty much will establish what I'm saying, that I couldn't figure out what was going on. * * * I think it was obvious I was confused because I was trying to—to respond to things that were out of my control even though I was supposed to be the one in control."

{¶ 84} In response to a question about whether she had reviewed transcripts from *Fleming v. Fleming*, respondent stated:

{¶ 85} "I doubt it. I doubt it. See, the thing about it is—this is—this may sound odd, and I'm a thorough person, but I've been buried in the politics in this court for five years now, * * * and you have to make tough choices, and if I really feel there's nothing in integrity about something, if I just know it's not—I

just know in my heart and gut this is not integrity, I'm not going to spend a lot of time on it, because I see people manipulating the system, I feel like they win if I divert my attention from serving those who are left out and poor and abused. They win.

{¶ 86} " * * * So my point is if I divert my attention to defending myself—I believe vengeance is mine, sayeth the Lord—I'm not going to spend my time responding to frivolous things."

{¶ 87} Respondent appears to argue that what the board characterized as misrepresentations and false statements were really her beliefs when she made them. The board concluded: "While Respondent generated by affidavit and judgment entry a persistent flow of self-serving statements and opinions of events contradicting both records and the otherwise unrebutted testimony of others and has based her defense in large part upon mischaracterization of her own actions and the actions and motives of others, the panel does not find that such were created solely for the purpose of deception of the panel, the Board and the Court in this disciplinary proceeding, but, rather, exemplify one of the principal causes of and proof of the complaints underlying this proceeding.

{¶ 88} " * * *

{¶ 89} "Respondent's testimony on cross-examination discloses not an acknowledgment of the wrongful nature of her own conduct, but perpetuates her attitude of avoiding direct answers to questions calling for categorical answers by what may be described as a persistent, rambling, confused, confusing and unresponsive discourse on Respondent's trials and tribulations caused by the malicious conduct of others she accuses of seeking to frustrate her personally and cause her to fail in her pursuit of her pure and lofty motives. Much of her testimonial digression contained misinformation, sophistry, distraction, falsehood and irrelevancy."

### Mitigating Circumstances

{¶ 90} As for mitigation, the panel noted that respondent has no prior disciplinary record, has generally cooperated in the disciplinary process, and generally enjoyed a reputation for good character in the community and among her friends and acquaintances. Although the panel noted that no evidence was received or offered by either party indicating that respondent's misconduct might have resulted from substance abuse, mental or physical illness, or emotional disorder, the panel also noted that respondent appeared to consider herself to be the victim of scheming and malevolence by her fellow judges, the complaining lawyers, some of her own counsel, and perhaps others unnamed, unknown, and unrevealed who have or had political or other malicious motives for complaining about her conduct. As the panel noted, however, no evidence was presented to the panel from which that conclusion realistically might be drawn.

## Sanction

{¶ 91} The panel recommended that respondent be suspended from the practice of law for one year, with six months stayed on condition of no further disciplinary violations within the one-year period of suspension. The Board of Commissioners on Grievances and Discipline considered the matter on February 9, 2007, and adopted the findings of fact and conclusions of law of the panel. However, given the extent and nature of the judicial misconduct seriously affecting the administration of justice, the board concluded that a longer suspension was required for the protection of the public. Thus, the board recommended that respondent be suspended from the practice of law for a period of two years, with one year stayed.

{¶ 92} Respondent objects to the board's findings and to the board's recommended sanction. Respondent contends that she violated neither the Code of Judicial Conduct nor the Code of Professional Responsibility.

{¶ 93} In determining the appropriate sanction to impose on respondent for her violations of the Code of Judicial Conduct and Disciplinary Rules, " 'we consider the duties violated, respondent's mental state, the injury caused, the existence of aggravating or mitigating circumstances, and applicable precedent.' " *Disciplinary Counsel v. Kaup*, 102 Ohio St.3d 29, 2004-Ohio-1525, 806 N.E.2d 513, ¶ 11, quoting *Disciplinary Counsel v. Evans* (2000), 89 Ohio St.3d 497, 501, 733 N.E.2d 609.

{¶ 94} Respondent violated duties owed under the Code of Judicial Conduct and Disciplinary Rules, including duties to the public, with two violations of DR 1–102(A)(4) and ten violations of DR 1–102(A)(5), and to the judiciary, by violations of Canons 1 and 2, 24 violations of Canon 3, and 13 violations of Canon 4.

{¶ 95} Respondent's misconduct personifies the expression "justice delayed is justice denied." Respondent's misconduct and, most notably, her failure to make rulings in pending cases demeaned attorneys and litigants in her court, causing them to seek justice in the courtrooms of other judges on respondent's bench. Respondent's fellow judges had to perform her duties as well as their own when she refused to rule on pending motions.

{¶ 96} The board relied on three judicial discipline cases in arriving at respondent's recommended sanction. In *Disciplinary Counsel v. Ferreri* (1999), 85 Ohio St.3d 649, 710 N.E.2d 1107, Judge Ferreri was suspended from the practice of law for 18 months with the final 12 months stayed, with six months' actual suspension without his judge's pay, for three incidents of intemperate, derogatory remarks to the news media about other judges. Judge Ferreri was found to have violated Canon 2, Canon 3(B)(9), Canon 3(C)(1), and Canon 4, Gov.Jud.R. I(2), Gov.Bar R. IV(2), and DR 8–102(B).

{¶ 97} Like Judge Ferreri, respondent has argued that many of her actions or inactions were out of concern for the children appearing in her courtroom and involved in the cases before her. However, this court observed that "strong feelings do not excuse a judge from complying with the judicial canons and the Disciplinary Rules." Id. at 654, 710 N.E.2d 1107.

{¶ 98} Moreover, respondent argued at oral argument that somehow decisions of judges of "specialized courts" that lie within the discretion of the judge should not be subject to sanction. Respondent's argument misses the point. First, respondent is not a judge of a specialized court. By "specialized" court, we must assume, respondent refers to what are usually termed "problem-solving courts," such as drug courts, mental health courts, and elder courts. See In re Certification of Need for Additional Judges (Fla.2002), 806 So.2d 446, 451. Respondent is a judge in a domestic relations court, which is a court that exists in all of Ohio's 88 counties. To conclude that domestic relations judges are unable to hold themselves to a high standard simply due to the nature of the cases over which they preside is an affront to the domestic relations judges throughout Ohio, who go about their jobs each and every day making decisions in the same environment in which respondent operated. Furthermore, clearly there is no lowering of professionalism standards for "specialized" courts. Respondent's argument is devoid of reason.

{¶ 99} The second case the board relied on was Disciplinary Counsel v. Karto (2002), 94 Ohio St.3d 109, 760 N.E.2d 412. Judge Karto was suspended from the practice of law for six months for abuse of the judicial power to punish for contempt, exhibiting bias without recusing himself, and conducting a juvenile hearing in the absence of the juvenile's counsel. Judge Karto was held to have violated Canons 1, 2, and 3, and several subsections of Canon 3 of the Code of Judicial Conduct, as well as DR 1–102(A)(5). Similarly to respondent, Judge Karto failed to journalize a contempt order, so the party was left with no ability to appeal. Id. at 110, 760 N.E.2d 412.

{¶ 100} The board concluded, and we agree, that respondent's misconduct was more extensive than that of Judge Karto and was more closely aligned with the pattern of misconduct demonstrated in Disciplinary Counsel v. O'Neill, 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286. Judge O'Neill was suspended from the practice of law for two years, with the second year stayed on conditions.

{¶ 101} The board noted that Judge O'Neill engaged in coercive tactics to improperly influence disposition of criminal cases in her court; engaged in a pattern of misrepresentation in her interaction with other judges, litigants, court personnel, and attorneys; and acted in a discourteous, unbecoming, and unprofessional manner toward her staff, court personnel, attorneys, probation officers, and members of the public. For this misconduct, O'Neill was found to have violated

Canons 1, 2, 3, and 4, and several subsections of Canon 3 of the Code of Judicial Conduct, as well as DR 1–102(A)(4) and (A)(5). Id. at ¶ 20, 28, and 40.

{¶ 102} Judge O'Neill, like respondent, engaged in "a pattern of rude, undignified, and unprofessional conduct that included abusive verbal outbursts, unjustified expulsions from the courtroom, and berating or humiliating persons in the presence of others." Id. at ¶ 30. Like respondent, Judge O'Neill claimed that she had sufficient justification for her actions or offered versions of facts that completely contradicted that of other witnesses. Id. at ¶ 32.

{¶ 103} This court noted in *O'Neill* :

{¶ 104} " 'Because they are so important to our society, judges must be competent and ethical, and their actions must foster respect for their decisions as well as for the judiciary as a whole. Given that they hold positions of considerable authority and are entrusted with a great deal of power and discretion, judges are expected to conduct themselves according to high standards of professional conduct. * * *

{¶ 105} " 'Judges should exercise their judicial functions with integrity, impartiality, and independence. They should perform their work with a high degree of competence, and should treat litigants, witnesses, attorneys, and others who appear before them with courtesy and respect. * * * In sum, they should inspire trust and confidence, and should bring honor to the judiciary.' " Id., 103 Ohio St.3d 204, 2004-Ohio-4704, 815 N.E.2d 286, ¶ 57–58, quoting Shaman, Lubet & Alfini, Judicial Conduct and Ethics (3d Ed.2000) 1–2.

{¶ 106} In the case at bar, the board concluded that "[r]espondent's persistent pattern of legal errors and her inability to recognize them for what they are and accept responsibility for them demonstrates her continuing lack of judicial temperament and judgment." Respondent argued at oral argument that many of these violations occurred while she was a judge and because she lost her re-election bid in 2006, she should not be sanctioned so harshly. However, the fact that respondent was not re-elected does not excuse her violations of the Code of Judicial Conduct while she served as a judge. A violation of the Disciplinary Rules or the Code of Judicial Conduct could occur in the first year of a sitting judge's elected term. If we were to permit the elections process to "take care" of judicial misconduct, the judge in that instance would be left unchecked for five years until the next election.

{¶ 107} Moreover, " ' [t]he worst of judges may run the best of campaigns and be reelected.' " Sankar, Disciplining the Professional Judge (2000), 88 Cal.L.Rev. 1233, 1250, quoting Testitor & Sinks, Judicial Conduct Organizations 2 (1980) 1. This court cannot ignore its duty to protect the public from judicial misconduct by relying solely upon the election process. Nor does respondent's suggestion remedy the fact that respondent's violations involving deception clearly affect not

just her ability to be a judge, but her ability to practice law. Moreover, attorneys lose their jobs over disciplinary violations, too, but the disciplinary process is in place to protect the public from an attorney who will otherwise practice in another setting. Judges and former judges are no different.

{¶ 108} Finally, respondent contended at oral argument that the appropriate response to respondent's conduct is the appellate process, not the disciplinary process. However, respondent clearly violated multiple canons of the Code of Judicial Conduct as well as multiple rules of the Code of Professional Responsibility. Moreover, often, as documented above, respondent either delayed decisions or made no decision at all in time-sensitive situations. In such cases, there would either be no judgment from which to appeal or an appeal would be an inadequate remedy for the harm done.

{¶ 109} Respondent's lack of insight into her own behavior is key to her inability to overcome her shortcomings at this time. As relator observed, regardless of whether respondent believed that what she said was accurate, respondent's version of events was persistently in "marked contrast" to the actual events. And the fact that respondent chose not to discover the truth or was incapable of doing so and instead chose to impose her will upon the persons assigned to her courtroom is indisputable evidence of what the board termed "her continuing lack of judicial temperament and judgment."

{¶ 110} Statements such as "[i]f you don't like it, you can appeal me," "every law was made to be moved around," and "[y]ou're nothing but a liar," or telling a party that she did not care what the party said to her, saying, "I don't care about any order, this child is not going anywhere except with Dad," telling an attorney who complained about ex parte communications with opposing counsel that she "doesn't care" about her objection, refusing to sign a transfer order and telling the attorney, "That's his emergency, not mine," are but a few examples of respondent's intemperance.

{¶ 111} Moreover, her statements reflect her displacement of blame for her own conduct, such as, "You have an Administrative Judge telling attorneys to go in and disrespect a Judge in egregious fashion." Further, referring to another judge, respondent testified that "this is a very political thing, and truth doesn't matter to these people, and they are ruthless."

{¶ 112} Respondent's intemperance and complete disrespect for litigants and attorneys who appeared before her, coupled with her total failure to take responsibility for her misconduct, mandate the sanction in this case. We adopt the findings of fact, conclusions of law, and recommendation of the Board of Commissioners on Grievances and Discipline. Respondent is hereby suspended from the practice of law for two years, with 12 months stayed on condition that

respondent commit no further disciplinary violations within the two-year period of suspension. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., dissents and would suspend respondent for one year, with six months stayed.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Lori J. Brown, First Assistant Disciplinary Counsel, for relator.

Kerger & Associates and Richard M. Kerger; Percy Squire Co., L.L.C., and Percy Squire; and Blank Rome L.L.P. and Nathaniel Jones, for respondent.